## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JANE A. RESTANI

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., ÇOLAKOĞLU METALUJI A.S. AND ÇOLAKOĞLU DIS TICARET A.S., <br><br> *Plaintiffs*, <br><br> and <br><br> ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., <br><br> *Plaintiff-Intervenor*, <br><br> v. <br><br> THE UNITED STATES, <br><br> *Defendant*, <br><br> and <br><br> REBAR TRADE ACTION COALITION, <br><br> *Defendant-Intervenor*. | **NON-CONFIDENTIAL VERSION** <br><br> Court No. 23-00059 <br><br> Confidential Business Proprietary Information Deleted from Pages: 7, 24 - 26, and 30 – 32. |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Leah N. Scarpelli
Jessica R. DiPietro
Matthew M. Nolan
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6013
*Counsel for Kaptan Demir Celik Endustrisi ve Ticaret A.S., Çolakoğlu Metalurji A.S. & Çolakoğlu Dis Ticaret A.S.*

September 18, 2023

# Table of Contents

I.      RULE 56.2 STATEMENT ................................................................................... 1

II.     ISSUE PRESENTED ......................................................................................... 2

    A.      Whether Commerce Used the Correct Date of Sale For Sales of Subject
        Merchandise to the U.S. Market ......................................................... 2

    B.      Whether Commerce's Treatment of Section 232 Tariffs is In Accordance
        with Law .................................................................................. 3

III.    STATEMENT OF FACTS ................................................................................ 4

IV.     STANDARD OF REVIEW .............................................................................. 9

V.      ARGUMENT ................................................................................................. 10

    A.      The Law, Commerce's Precedent, and Substantial Record Evidence
        Support a Determination that Contract Date is the Appropriate Date of
        Sale for Kaptan's and Çolakoğlu's U.S. Sales .................................... 11

        1.      The Appropriate Date of Sale Is the Date on Which the Material
            Terms Are Set ................................................................... 12

        2.      The Department Has An Established Practice In Determining The
            Date of Sale .................................................................... 16

    B.      Substantial Evidence Supports That U.S. Sales Were Set in the Contract
        and Did Not Change ....................................................................... 22

        1.      The Material Terms of Kaptan's U.S. Sales Were Set in the
            Contract and Did Not Change ............................................ 23

        2.      The Material Terms of Çolakoğlu's U.S. Sales Were Set in the
            Contract and Did Not Change ............................................ 27

    C.      The Department Must Provide a Reasoned Explanation for Any Deviation
        from its Established Practice ............................................................. 32

    VI.     CONCLUSION ............................................................................................... 35

AFDOCS:198838144.1

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allied Tube & Conduit Corp. v. United States*,
127 F. Supp. 2d 207 (Ct. Int'l Trade 2000) ...............................................................11, 13, 14

*Allied Tube & Conduit Corp. v. United States*,
132 F. Supp. 2d 1087 (Ct. Int'l Trade 2001) ........................................................................14

*ArcelorMittal USA LLC v. United States*,
302 F. Supp. 3d 1366 (Ct. Int'l Trade 2018) ..................................................................29, 30

*Asociacion Colombiana de Exportadores de Flores v. United States*,
6 F. Supp. 2d 865 (Ct. Int'l Trade 1998) ..............................................................................10

*Atar, S.r.l. v. United States*,
637 F. Supp. 2d 1068 (Ct. Int'l Trade 2009) .................................................................15, 16

*Beardmore v. Dep't of Agric.*,
761 F.2d 677 (Fed. Cir. 1985).................................................................................................32

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
426 F. Supp. 3d 1395 (Ct. Int'l Trade 2020), *rev'd on other grounds*, 5 F.4th
1367 (Fed. Cir. 2021).................................................................................................... *passim*

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
63 F.4th 25 (Fed. Cir. 2023) .....................................................................................................3

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984).................................................................................................................10

*Çolakoğlu Metalurji A.S. v. United States*,
394 F. Supp. 2d 1379 (Ct. Int'l Trade 2005) ........................................................................15

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938).................................................................................................................10

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007)...............................................................................................16

*DuPont Teijin Films USA, LP v. United States*,
407 F.3d 1211 (Fed. Cir. 2005)...............................................................................................10

*Eregli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*,
308 F. Supp.3d 1297 (Ct. Int'l Trade 2018) .......................................................15, 30, 33, 34

AFDOCS:198838144.1

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
   31 CIT 1793 (2007) ..............................................................................................33

*Hyundai Heavy Indus. Co. v. United States*,
   332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) ...............................................21, 28

*Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
   No. 21-00306, 2023 WL 5426584 (Ct. Int'l Trade Aug. 23, 2023)..........................3

*Jiaxing Brother Fastener Co. v. United States*,
   822 F.3d 1289 (Fed. Cir. 2016)...............................................................................28

*Nakornthai Strip Mill Pub. Co. v. United States*,
   614 F. Supp. 2d 1323 (Ct. Int'l Trade 2009) ...................................................15, 19

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006)..................................................................................9

*NMB Sing. Ltd. v. United States*,
   557 F.3d 1316 (Fed. Cir. 2009)................................................................................32

*NTN Bearing Corp. v. United States*,
   74 F.3d 1204 (Fed. Cir. 1995)..................................................................................11

*Nucor Corp. v. United States*,
   612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ................................................. *passim*

*Qingdao Sea-Line Trading Co. v. United States*,
   766 F.3d 1378 (Fed. Cir. 2014)................................................................................22

*Rebar Trade Action Coal. v. United States*,
   Ct. No. 14-00268, 2016 WL 5122639 (Ct. Int'l Trade Sept. 21, 2016)............11, 14

*Rhone-Poulenc, Inc. v. United States*,
   927 F. Supp. 451 (Ct. Int'l Trade 1996) ..................................................................10

*Sahaviriya Steel Indus. Pub. Co. v. United States*,
   714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371 (Fed. Cir.
   2011) .......................................................................................................................30

*SeAH Steel Corp. v. United States*,
   25 CIT 133 (2001) ...................................................................................................34

*Shenzhen Xinboda Indus. Co. v. United States*,
   456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) ............................................28, 29, 35

*Toscelik Profil ve Sac Endustrisi A.S. v. United States*,
   256 F. Supp. 3d 1260 (Ct. Int'l Trade 2017) ...................................................11, 15

AFDOCS:198838144.1

*Union Steel v. United States*,
713 F.3d 1101 (Fed. Cir. 2013)........................................................................10

*USEC Inc. v. United States*,
498 F. Supp. 2d 1337 (Ct. Int'l Trade 2007) ...................................................16

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................................9

19 U.S.C. § 1677a(a)...........................................................................................12

**Regulations**

19 C.F.R. § 351.401(i) .........................................................................2, 10, 13, 21

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296 (Dep't
Commerce May 19, 1997) (final rule) ...................................................... *passim*

**Administrative Determinations**

*1,1,1,2-Tetrafluoroethane (R-134a) From the People's Republic of China*,
88 Fed. Reg. 27861 (Dep't Commerce May 3, 2023) (prelim. AD results,
partial rescission, and prelim. no shipments determ.; 2021-2022), and
accompanying Decision Memorandum ..............................................................17

*1,1,1,2-Tetrafluoroethane (R-134a) From the People's Republic of China*,
88 Fed. Reg. 60639 (Dep't Commerce Sept. 5, 2023) (final AD results &
determ. of no shipments; 2021-2022), and accompanying Issues and Decision
Memorandum.................................................................................................17, 28

*Certain Cut-to-Length Carbon Steel Plate from Romania*,
72 Fed. Reg. 6522 (Dep't Commerce Feb. 12, 2007) (final AD results &
partial rescission), and accompanying Issues and Decision Memorandum.................. *passim*

*Certain Hot-Rolled Carbon Steel Flat Products From Thailand*, 66 Fed. Reg.
49622 (Dep't Commerce Sept. 28, 2001) (final LTFV determ.), and
accompanying Issues and Decision Memorandum..............................................18

*Certain Preserved Mushrooms From the People's Republic of China*,
74 Fed. Reg. 50946 (Dep't Commerce Oct. 2, 2009) (prelim. AD results of
new shipper rev.)................................................................................................18

*Certain Welded Carbon Steel Pipes and Tubes from Thailand*,
66 Fed. Reg. 18901 (Dep't Commerce Apr. 12, 2001) (prelim. AD results) ..........................18

*Circular Welded Carbon Steel Pipes and Tubes from Thailand*,
71 Fed. Reg. 17810 (Dep't Commerce Apr. 7, 2006) (prelim. AD results) ...........................18

iv

*Circular Welded Carbon Steel Pipes and Tubes From Thailand*,
    77 Fed. Reg. 61738 (Dep't Commerce Oct. 11, 2012) (final AD Results), and
    accompanying Issues and Decision Memorandum..........................................................20, 26

*Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*,
    63 Fed. Reg. 32833 (Dep't Commerce Jun. 16, 1998) (final AD results)..................17, 20, 26

*Emulsion Styrene-Butadiene Rubber from Mexico*,
    64 Fed. Reg. 14872 (Dep't Commerce Mar. 29, 1999) (final LTFV determ.).......................19

*Polyethylene Terephthalate Resin From the Sultanate of Oman*,
    87 Fed. Reg. 75594 (Dep't Commerce Dec. 9, 2022) (final AD results; 2020-
    2021), and accompanying Issues and Decision Memorandum.........................................19, 22

*Solid Urea from the Russian Federation*,
    75 Fed. Reg. 51440 (Dep't Commerce Aug. 20, 2010) (final AD results), and
    accompanying Issues and Decision Memorandum.................................................................19

*Steel Concrete Reinforcing Bar from the Republic of Turkey*, 86 Fed. Reg. 43181
    (Dep't Commerce Aug. 6, 2021) (prelim. AD results & determ. no shipments;
    2019-2020), and accompanying Issues and Decision Memorandum .....................................28

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 87 Fed. Reg. 7118
    (Dep't Commerce Feb. 8, 2022) (final AD results & determ. no shipments;
    2019-2020), and accompanying Issues and Decision Memorandum .....................................24

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
    87 Fed. Reg. 47975 (Dep't Commerce Aug. 5, 2022) (prelim. AD results &
    determ. of no shipments; 2020-2021), and accompanying Decision
    Memorandum............................................................................................................................8

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
    88 Fed. Reg. 7941 (Dep't Commerce Feb. 7, 2023) (final AD results &
    determ. of no shipments; 2020-2021), and accompanying Issues and Decision
    Memorandum .................................................................................................... *passim*

*Sulfanilic Acid from Portugal*,
    67 Fed. Reg. 60219 (Dep't Commerce Sept. 25, 2002) (final LTFV determ.),
    and accompanying Issues and Decision Memorandum.........................................................21

*White Grape Juice Concentrate From Argentina*,
    87 Fed. Reg. 66269 (Dep't Commerce Nov. 3, 2022) (prelim. affirm. LTFV
    determ., postponement of final determ., ext. of provisional measures), and
    accompanying Decision Memorandum ..................................................................................17

*White Grape Juice Concentrate From Argentina: Suspension of Antidumping
    Duty Investigation*, 88 Fed. Reg. 17808 (Dep't Commerce Mar. 24, 2023) ..........................17

AFDOCS:198838144.1

**Other Authorities**

Agreement on Implementation of Article VI of the General Agreement on Tariffs
and Trade 1994 ....................................................................................................12

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep.
No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040....................................................12

AFDOCS:198838144.1

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI**

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., ÇOLAKOĞLU METALUJI A.S. AND ÇOLAKOĞLU DIS TICARET A.S., | ) ) ) ) |
| *Plaintiffs*, | ) ) |
| and | ) ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) ) ) |
| *Plaintiff-Intervenor*, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, | ) ) |
| and | ) ) |
| REBAR TRADE ACTION COALITION, | ) ) ) |
| *Defendant-Intervenor.* | ) ) |

**NON-CONFIDENTIAL VERSION**

Court No. 23-00059

Confidential Business Proprietary Information Deleted from Pages: 7, 24 - 26, and 30 – 32.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO RULE 56.2**

## I.  RULE 56.2 STATEMENT

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, Plaintiffs Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan"), Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. ("Çolakoğlu") (collectively, "Plaintiffs"), foreign manufacturers and foreign exporters of steel concrete reinforcing bar ("rebar") from Turkey, hereby submit this memorandum of points and authorities in support of their motion for judgment on the agency record and challenge the final affirmative determination as set forth below.

1

This is an appeal from the final results in the 2020-2021 administrative review of the antidumping duty order on *Steel Concrete Reinforcing Bar From the Republic of Turkey* ("Rebar from Turkey").  The U.S. Department of Commerce's ("Commerce") final results were published in the *Federal Register* on February 7, 2023.  *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 7941 (Dep't Commerce Feb. 7, 2023) (final AD results & determ. of no shipments; 2020-2021) ("*Final AD Results*"), P.R. 219, ECF 27-4.  Commerce's factual and legal conclusions underlying the *Final AD Results* are set forth in its Issues and Decision Memorandum. Memorandum from J. Maeder to L. Wang, re: Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review Antidumping duty Order on Steel Concrete Reinforcing Bar from Turkey (February 1, 2023) ("*Final IDM*"), P.R. 203, ECF 27-5.

## II.      ISSUE PRESENTED

### A.      Whether Commerce Used the Correct Date of Sale For Sales of Subject Merchandise to the U.S. Market

Commerce's reliance on the date of invoice as the date of U.S. sales for Kaptan and Çolakoğlu is not based on substantial evidence nor in accordance with law.  Commerce's reliance on invoice date is improper because the evidentiary record supports that another date "better reflects the date on which" Kaptan and Çolakoğlu, respectively, "establish{} the material terms of sale." 19 C.F.R. § 351.401(i).

Although Kaptan reported its date of sale as the contract date and provided the requisite evidence on the record to support its reporting, Commerce instead found the earlier of shipment date or date of invoice to be the more appropriate date of sale. *Final IDM* at 11, P.R. 203. Likewise, although Çolakoğlu also provided ample evidence demonstrating that the material terms of sales did not change after the contract date, Commerce relied on the invoice date instead

AFDOCS:198838144.1

of the sales order date (*i.e.*, contract date) to determine the date of sale for Çolakoğlu's U.S. sales because "Çolakoğlu's sales process does not preclude changes in the material terms of sale between the times of the contract and the invoice." *Id.* at 12.

In both instances, Commerce improperly ignored its obligation to review the unique circumstances and factual evidence on the record of this review when making its date of sale determination. Given the unique facts of this review cycle, in which the material terms of the contracts did not change prior to the invoice date for Plaintiffs, this Court should remand the *Final AD Results* for Commerce to instead use the contract date as the date of sale because that is the date on which the material terms of U.S. sales are fixed.

B.    Whether Commerce's Treatment of Section 232 Tariffs is In Accordance with Law

Plaintiffs no longer wish to pursue the second claim in their complaint, that "Commerce's determination to treat the special Section 232 tariffs as ordinary customs duties and deduct the full amount of tariffs paid from Kaptan's and Çolakoğlu's export price, respectively," is not in accordance with law or based on substantial evidence.  Compl. at ¶ 34, ECF No. 8.  Although Plaintiffs maintain that Commerce's determination is not based on substantial evidence or in accordance with law, recent decisions at the Court of Appeals for the Federal Circuit and the Court of International Trade have foreclosed the argument as presented in this administrative review.  *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 37 (Fed. Cir. 2023) ("{W}e conclude that the specific duty imposed by the President in Proclamation 9705 was properly treated by the President's subordinate, the Secretary of Commerce, as a 'United States import dut{y}' under § 1677a(c)(2)(A)."); *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, No. 21-00306, 2023 WL 5426584, at *4 (Ct. Int'l Trade Aug. 23, 2023) (holding that the Federal Circuit's proclamation-specific test supports

treating the Turkey-specific Section 232 duties as United States import duties and sustaining

Commerce's treatment of such duties).

## III.    STATEMENT OF FACTS

Plaintiffs filed their requests for an administrative review on July 30, 2021.  *See*

Çolakoğlu's Request for Antidumping Administrative Review (July 30, 2021), P.R. 3; Kaptan's

Request for Antidumping Administrative Review (July 30, 2021), P.R. 4. On September 29,

2021, Commerce designated both Kaptan and Çolakoğlu as mandatory respondents.

Memorandum from R. Copyak to M. Skinner, re: Respondent Selection Memorandum for

Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from

the Republic of Turkey; 2020-2021 (Sept. 29, 2021) ("Respondent Selection Memo"), C.R. 3,

P.R. 22.  Both Kaptan and Çolakoğlu actively participated in the administrative review by filing

responses to questionnaires and supplemental questionnaires.  *See e.g.,* Kaptan's Response to the

Department's Section A Questionnaire (Oct. 29, 2021) ("Kaptan Sec. A QR"), C.R. 4-11, P.R.

38; Kaptan's Response to the Department's Section B Questionnaire (Nov. 22, 2021) ("Kaptan

Sec. B QR"), C.R. 27-44, P.R. 58; Kaptan's Response to the Department's  Section C

Questionnaire (Nov. 22, 2021) ("Kaptan Sec. C QR"), C.R. 81-99, P.R. 61; Kaptan's Response

to the Department's Section D High Inflation Questionnaire (Dec. 1, 2021) ("Kaptan Sec. D

QR"), C.R. 121-148, P.R. 63; Kaptan's Response to Supplemental Sections A-D Questionnaire

(Mar. 11, 2022) ("Kaptan 1st Supp. A-C QR"), C.R. 169-179, P.R. 88, Kaptan's Response to

Supplemental Section D Questionnaire (Apr. 4, 2022) ("Kaptan Supp. D QR"), C.R. 182-208,

P.R. 105; Kaptan's Response to Second Supplemental Section D Questionnaire (Question 1)

(May 13, 2022) ("Kaptan 2nd Supp. D QR – Qu. 1"), C.R. 241-242, P.R. 116; Kaptan's

Response to Second Supplemental Section D Questionnaire (Questions 2-4) (May 20, 2022)

("Kaptan 2nd Supp. D QR"), C.R. 269-274, P.R. 127; Kaptan Demir Celik Endustrisi ve Ticaret

AFDOCS:198838144.1

A.S.'s Response to the Department's Second Supplemental Sections A-C Questionnaire (May 20, 2022) ("Kaptan 2nd Supp. A-C QR"), C.R. 253-268, P.R. 126; Kaptan's Response to Third Supplemental Section D Questionnaire (June 6, 2022) ("Kaptan 3rd Supp. D QR"), C.R. 279-281, P.R. 137; and Kaptan's Response to Revised Reporting Requirements Supplemental Questionnaire (Fifth Supplemental Questionnaire Response) (July 20, 2022) ("Kaptan 5th Supp QR"), , C.R. 296-299, P.R. 149; Çolakoğlu's Response to the Department's Section A Questionnaire (Oct. 29, 2021) ("Çolakoğlu Sec. A QR"), C.R. 15-26, P.R. 39-44; Çolakoğlu's Response to Section B Questionnaire (Nov. 22, 2021) ("Çolakoğlu Sec. B QR"), C.R. 45-57, P.R. 59; Çolakoğlu's Response to Section C Questionnaire (Nov. 22, 2021) ("Çolakoğlu Sec. C QR"), C.R. 58-80, P.R. 60; Çolakoğlu's Response to Section D Questionnaire (Dec. 1, 2021) ("Çolakoğlu Sec. D QR"), C.R. 100-120, P.R. 62, Çolakoğlu's Response to Supplemental Sections A-C Questionnaire (Mar. 11, 2022, resubmitted May 19, 2022) ("Çolakoğlu Supp. A-C QR"), C.R. 244-252, P.R. 122; Çolakoğlu's Response to Second Supplemental Sections A-C Questionnaire (Third Supplemental Questionnaire Response) (June 6, 2022) ("Çolakoğlu 2nd Supp. A-C QR"), C.R. 282-289, P.R. 138; Çolakoğlu's Response to the Second Supplemental Section D Questionnaire (Fourth Supplemental Questionnaire Response) (June 21, 2022) ("Çolakoğlu 2nd Supp. D QR"), C.R. 290-294, P.R. 141; Çolakoğlu's Response to Revised Reporting Requirements Supplemental Questionnaire (Fifth Supplemental Questionnaire Response) (July 20, 2022) ("Çolakoğlu 5th Supp. QR"), C.R. 300-303, P.R. 150.

Kaptan provided substantial evidence relating to date of sale and demonstrating that invoice date was not the best date of sale for sales to the United States during the POR.  Kaptan's Sec. C QR, C.R. 81-99, P.R. 61; Kaptan's Response to Supplemental Sections A-D Questionnaire (Mar. 11, 2022) ("Kaptan 1st Supp. A-C QR"), C.R. 169-179, P.R. 88; and 2nd

Supp. A-C QR, C.R. 253-268, P.R. 126. Specifically, in it is initial questionnaire response, Kaptan reported that "all material terms of sale including the price, quantity, size breakdown, and latest date of shipment were finalized on the date of the contract and did not change between the invoice and contact date." Kaptan Sec. C QR at C-18, C.R. 81-99, P.R. 61.  Kaptan provided a "comparison chart showing that the material terms of Kaptan's sales are set on the date of contract and consistent with the final invoice (within permissible tolerances)."  *Id.* at Exh. C-6. In its supplemental Section A-C Questionnaire, Kaptan "provided additional explanation as to why the material terms of sale did not change between invoice and contract date."  Kaptan 1st Supp. A-C QR at S1-4 – S1-7, C.R. 169-179, P.R. 88.  Kaptan also provided additional supporting documentation showing that the contracts were binding and could not be changed.  *Id.* at Exh. S1-6.  In its Kaptan 2nd Supp. A-C QR, C.R. 253-268, P.R. 126, Kaptan again explained that during this "review segment, there were no post-contract amendments and the material terms of sale (price and quantity) were finalized on the date of the contract for all sales during this POR."  Kaptan 2nd Supp. A-C QR at S3-4, C.R. 253-268, P.R. 126.  Kaptan provided supporting information which demonstrates that "the total quantity of each invoice was within the tolerance noted in the corresponding contract," "the unit price of each product listed in the contract matches the unit price noted in invoice," and "quantity in terms of the size breakdown is also within the size tolerance specified in each contract."  *Id.* at S3-5, Exh. S3-3a.

Likewise, Çolakoğlu provided substantial evidence that invoice date was not the best date of sale for sales to the United States during the POR. Sec. C QR, C.R. 58-80, P.R. 60; Supp. A-C QR, C.R. 244-252, P.R. 122; and 2nd Supp. A-C QR, C.R. 282 -289 , P.R.138. Specifically, in its initial Section C questionnaire response, Çolakoğlu provided a "chart demonstrating that sales order contract date is the date of sale" for U.S. Sales.  Sec. C QR at C-19, Exh. C-6 C.R. 58-80,

P.R. 60.  The chart demonstrated that "the material sales terms i.e. price, quantity and size/product type determined at the date of sales order have not been changed at the date of invoice." *Id.* Çolakoğlu's reporting covered [        ] of the total quantity of sales and [        ] of the total value of sales, out of [        ] invoices. *Id.*  In its second questionnaire response, Çolakoğlu "confirm{ed} that all U.S. sales with an invoice or shipment date within the POR." Supp. A-C QR, at S1-5, C.R. 244-252, P.R. 122.  At that time, Commerce rejected additional supporting information related to date of sale.  *See* Letter from L. Nigro, Program Mgr., Office VII to M. Nolan, re: Rejection of Untimely New Factual Information (May 17, 2022), P.R. 118 In its third supplemental questionnaire response, Çolakoğlu again described its sales process and that it could not "present an evidence of how" a change between the contract and the invoice would occur "{b}ecause no changes to the material terms of sale have occurred from the original sales contract through the time of the actual shipment."  2nd Supp. A-C QR, at S3-10-11, C.R. 282 -289, P.R.138.  In response to Commerce's question asking for explanation of "whether there were any U.S. sales during the POR in which there were any line items with changes in material terms of sale from the original sales order contract, the invoice, and the actual shipment which exceeded agreed-upon tolerances," Çolakoğlu explained that there were "no line item changes to any of these material terms of sale."  2nd Supp. A-C QR at S3-11, C.R. 282 -289, P.R.138.  Çolakoğlu provided supporting purchase orders and sales order contracts demonstrating that there were no changes outside of the agreed upon tolerances and, thus, no changes to the material terms of sale. 2nd Supp. A-C QR, at S3-12 at Exh. S3-8, C.R. 282 -289, P.R.138.  With this additional information, Çolakoğlu now reported a total of [        ] of the total quantity of sales and [        ] of the total value of sales, out of [        ] invoices, all supporting contract date as the date of sale for U.S. sales. *Id.*

On August 5, 2022, Commerce issued its preliminary results in which it assigned Çolakoğlu an individual rate of 1.13 percent and Kaptan an individual rate of 5.79 percent. *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 87 Fed. Reg. 47975 (Dep't Commerce Aug. 5, 2022) (prelim. AD results & determ. of no shipments; 2020-2021) ("*Preliminary AD Results*"), P.R. 178, and accompanying Issues and Decision Memorandum ("*PDM*"), P.R. 155. In the *Preliminary AD Results*, although Kaptan reported the contact date as the date of sale and provided record evidence demonstrating that the material terms of sale did not change after the contract date, Commerce relied on the invoice date as the date of sale for U.S. sales. *See PDM* at 12, P.R.155.

Kaptan and Çolakoğlu submitted a joint case brief to Commerce on September 13, 2022. *See* Turkish Respondents' Case Brief (Sept. 13, 2022), C.R. 345, P.R. 190.  In their case brief, Kaptan and Çolakoğlu provided ample record evidence and precedent demonstrating that this 2020-2021 review of the rebar from Turkey order is different from prior reviews and that the appropriate U.S. date of sale for Kaptan was the contract date and the appropriate U.S. date of sale for Çolakoğlu is sale order date (i.e., contract date). *Id.* at 18-28.  With respect to Kaptan, Kaptan demonstrated that there were no changes to the material terms of sale after the contract date, and that all parties agree in the contract that there will be no changes to the terms of the sale. *Id.* at 20-23.  With respect to Çolakoğlu, Çolakoğlu provided almost three dozen samples supporting that its contracts do not change after the date of sale, and that there are no deviations from to the terms of sale as defined in the sales contract.  *Id.* at 23-28.  Plaintiffs argued that, in both instances, Commerce improperly ignored its obligation to review the unique circumstances and factual evidence on the record of this review when making its date of sale determination. Given the unique facts of this review cycle, in which the contracts did not change prior to the

AFDOCS:198838144.1

invoice date for Kaptan and Çolakoğlu, Commerce should have relied on contract date as the date of U.S. sales because that was the date on which material terms of U.S. sales were fixed. *Id.* at 2.

On September 21, 2022, Çolakoğlu and Kaptan submitted a joint rebuttal brief. *See* Turkish Respondents' Rebuttal Brief (Sept. 21, 2022), C.R. 347, P.R. 194.

On February 1, 2023, Commerce issued its *Final AD Results*, in which it continued to rely on invoice date as the date of sale for U.S. sales for both Çolakoğlu and Kaptan. *See Final IDM* at 8-12, P.R. 203. Commerce determined that Kaptan had not demonstrated that the material terms of sale were finalized at the contract date and, and relied on invoice date for Kaptan's U.S. date of sale. *Id.* at 10-11. Commerce similarly stated that it was relying on invoice date as Çolakoğlu's U.S. date of sale because Çolakoğlu did not provide evidence to the record to differentiate the 2020-2021 AD review from previous reviews, where Commerce had determined that the material terms of sale changed after the contract date. *Id.* at 12. The *Final AD Results* are unsupported by substantial evidence on the record and are otherwise not in accordance with law with respect to the matters set forth below.

## IV.   STANDARD OF REVIEW

This Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as

AFDOCS:198838144.1

adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d

1211, 1215 (Fed. Cir. 2005), quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938).

When reviewing Commerce's statutory interpretations, the Court applies the two-part test

set forth in the U.S. Supreme Court's opinion in *Chevron. Union Steel v. United States*, 713 F.3d

1101, 1106-07 (Fed. Cir. 2013) (citing *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467

U.S. 837, 842-43 (1984)). Under *Chevron*, to determine whether an agency's interpretation of the

statute is entitled to deference, the Court conducts a two-part inquiry. Under the first prong,

where Congress has spoken directly to the question at issue the Court and the agency must give

effect to the unambiguously expressed intent of Congress. *See Chevron*, 467 U.S. at 842-43. If,

however, the statute is vague or silent on an issue, the Court may uphold Commerce's

interpretation, but only so long as the interpretation is reasonable. *See id*. at 843.

This Court has found Commerce's determinations unlawful "where Commerce has failed

to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an

adequate basis for its conclusions." *Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451, 454

(Ct. Int'l Trade 1996); *see also Asociacion Colombiana de Exportadores de Flores v. United*

*States*, 6 F. Supp. 2d 865, 880 (Ct. Int'l Trade 1998).

## V.    ARGUMENT

Commerce's objective with respect to date of sale is to determine when all sales terms are

finalized for purposes of reporting the correct universe of sales.  In keeping with this purpose,

Commerce's criteria for establishing the date of sale is the first point at which the terms are

fixed, which is most commonly "when the seller demands payment (*i.e.*, when the sale is

invoiced)."  *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27349 (Dep't

Commerce May 19, 1997) (final rule) ("*Preamble*"); *see also* 19 C.F.R. § 351.401(i).  However,

Commerce may select an alternative date if "presented with *satisfactory evidence* that the

material terms of sale are finally established on a date other than the date of invoice." *Preamble*, 62 Fed. Reg. at 27349 (emphasis added). Specifically, a party "must demonstrate that the material terms of sale were 'firmly' and 'finally' established on its proposed date of sale," rather than the date of invoice. *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 256 F. Supp. 3d 1260, 1263 (Ct. Int'l Trade 2017) (citing *Preamble*, 62 Fed. Reg. at 27348-49). Commerce's "duty is to determine when a meeting of the minds took place." *Rebar Trade Action Coal. v. United States*, Ct. No. 14-00268, 2016 WL 5122639, at *8 (Ct. Int'l Trade Sept. 21, 2016) (citation omitted).

Both the U.S. Court of International Trade ("CIT") and the U.S. Court of Appeals for the Federal Circuit ("CAFC") have consistently held that the Department is under a duty to determine dumping margins as accurately as possible. *See, e.g.*, *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995); *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 218 (Ct. Int'l Trade 2000). As the CIT has confirmed, "{f}lexibility in Commerce's date of sale analysis is a natural corollary of Commerce's overarching obligation to determine dumping margins as accurately as possible." *Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1308 (Ct. Int'l Trade 2009).

A. <u>The Law, Commerce's Precedent, and Substantial Record Evidence Support a Determination that Contract Date is the Appropriate Date of Sale for Kaptan's and Çolakoğlu's U.S. Sales</u>

Commerce's findings that "Kaptan has not demonstrated that the material terms of sale are finalized upon the contract date" and "the variances in quantity reported by Çolakoğlu are indicative of a pattern of material changes in quantity," resulting in a U.S. date of sale based on the invoice date, are inconsistent with the record evidence. *Final IDM* at 10, 12, P.R. 203. Commerce's explanation that using the invoice date as Kaptan's and Çolakoğlu's U.S. date of

AFDOCS:198838144.1

sale, respectively, "conforms with {its} longstanding practice of using the earlier of the invoice date or the shipment date as the date of sale if no other date is more appropriate," *id.* at 12, casts aside extensive record evidence demonstrating otherwise and disregards well-established precedent to the contrary.  *See id.* at 10-12.  The material terms of Kaptan's and Çolakoğlu's sales contracts cannot and did not change prior to invoicing and shipment of the subject merchandise to the United States during the period of review ("POR").

Indeed, Commerce's regulations, long standing practice, and the well-established precedent of the reviewing courts support a finding that the contract date is the appropriate date of sale in this review.

1. *The Appropriate Date of Sale Is the Date on Which the Material Terms Are Set*

In selecting the appropriate date of sale, there is much guidance for Commerce to consider, starting with the statute and regulations. The statute – 19 U.S.C. § 1677a(a) – defines export price as when the merchandise is "first sold" to an unaffiliated customer, but does not specify the date of sale. The trade agreements adopted by the World Trade Organization and incorporated into U.S. law, however, provide that "{n}ormally, the date of sale would be the date of contract, purchase order, order confirmation or invoice, *whichever establishes the material terms of sale.*"  *Nucor*, 612 F. Supp. 2d at 1300 (quoting Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Art. 2.4.1 n.8). The Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act likewise specifically defines the "date of sale" as the "date when the material terms of sale are established." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 810 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4153. "Through the Uruguay Round Agreements Act and the Statement of Administrative Action, Congress thus

'expressed its intent that, for antidumping purposes, the date of sale be *flexible* so as to

accurately reflect the true date on which the material elements of sale were established.'" *Nucor*,

612 F. Supp. 2d at 249 (quoting *Allied Tube*, 127 F. Supp. 2d at 219).

Expanding upon this definition, Commerce's regulations further state:

> In identifying the date of sale of the subject merchandise or foreign
> like product, the Secretary *normally* will use the date of invoice, as
> recorded in the exporter or producer's records kept in the ordinary
> course of business. However, *the Secretary may use a date other
> than the date of invoice if the Secretary is satisfied that a different
> date better reflects the date on which the exporter or producer
> establishes the material terms of sale*.

19 C.F.R. § 351.401(i) (emphasis added). The use of the word "normally" in Commerce's

regulations again indicates that there are necessarily times when use of the invoice date is not

appropriate. In those instances, the regulations establish that the Department has the discretion to

use a different date of sale based on when the material terms were established by the parties. *Id.*

Turning next to the "*Preamble*" to the Department's regulations, Commerce again

acknowledges that it may select an alternative date if "presented with *satisfactory evidence* that

the material terms of sale are finally established on a date other than the date of invoice."

*Preamble*, 62 Fed. Reg. at 27349 (emphasis added). Commerce specifically explains its date of

sale methodology as follows:

> In some cases, it may be inappropriate to rely on the date of
> invoice as the date of sale, because the evidence may indicate that,
> for a particular respondent, the material terms of sale usually are
> established on some date other than the date of invoice. . . . {W}e
> had intended this type of flexible approach through our use of the
> word "normally."

*Id.* With regards to contracts in particular, Commerce notes that the language in its regulations is

"sufficiently flexible" to enable it "to review these situations carefully on a case-by-case basis."

*Id.* at 27350. Commerce further states that "in situations . . . in which the parties engage in

formal negotiation and contracting procedures, the Department usually will use a date other than the date of invoice," provided "the terms of sale {are} firmly established and not merely proposed." *Id.* at 27349. Accordingly, the Department clearly stated its intention to adopt flexibility in choosing the appropriate date of sale based on the facts of each case and noted that use of invoice date may not be appropriate where respondents use binding contracts.

The CIT has also repeatedly recognized Commerce's flexibility in this area, confirming that "{f}lexibility in Commerce's date of sale analyses is more than a mere regulatory preference; it rises to the level of a statutory mandate." *Nucor*, 612 F. Supp. at 1307 (citing *Allied Tube*, 127 F. Supp. 2d at 216-17). "{R}ather than endorsing a mechanistic methodology conclusively establishing invoice date as the date of sale . . . , Congress instead 'expressed its intent that, for antidumping purposes, the date of sale be flexible so as to accurately reflect the true date on which the material elements of sale were established.'" *Id.* at 1307-08. Commerce's "duty is to determine when a meeting of the minds took place." *Rebar Trade Action Coal.*, 2016 WL 5122639, at *8 (citation omitted). "{T}he date at which no further changes were realistically possible {has been found} to be determinative." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 426 F. Supp. 3d 1395, 1403 (Ct. Int'l Trade 2020), *rev'd on other grounds*, 5 F.4th 1367 (Fed. Cir. 2021); *see also*, *Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (Ct. Int'l Trade 2001) ("As elaborated by Department practice, a date other than invoice date 'better reflects' the date when 'material terms of sale' are established if the party shows that the 'material terms of sale' undergo no meaningful change (and are not subject to meaningful change) between the proposed date and the invoice date.").

In analyzing whether use of an alternate date of sale is appropriate, the CIT has found a party "must demonstrate that the material terms of sale were 'firmly' and 'finally' established on

its proposed date of sale," rather than the date of invoice. *Toscelik Profil*, 256 F. Supp. 3d at 1263 (citing *Preamble*, 62 Fed. Reg. at 27348-49). In other words, there is "a 'rebuttable presumption' in favor of the invoice date unless the proponent of a different date produces satisfactory evidence that the material terms of sale were established on that alternate date." *Eregli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*, 308 F. Supp.3d 1297, 1306 (Ct. Int'l Trade 2018) (citations omitted). However, "neither Congress nor the agency in its regulations expresses any 'preference' at all on the matter" and the rebuttable presumption "has been successfully rebutted in numerous cases in the past." *Nucor*, 612 F. Supp. 2d at 1304 (citing *Çolakoğlu Metalurji A.S. v. United States*, 394 F. Supp. 2d 1379, 1380 (Ct. Int'l Trade 2005)). As such, "the invoice date in fact is merely the starting point of Commerce's analysis" and is not "intended to foreclose the possibility that another date could be chosen as the date of sale." *Id.* at 1307 (internal quotations omitted) (citation omitted).

Indeed, as detailed above, where Commerce "is presented with satisfactory evidence that the material terms of sale are . . . established on a date other than the date of invoice, the Department *will* use that alternative date as the date of sale." *Preamble*, 62 Fed. Reg. at 27349 (emphasis added). The CIT has consistently held that the material terms of a sale include the price, quantity, and payment terms, and has upheld Commerce's use of an alternate date of sale where those terms are fixed before the invoice date. *See, e.g.*, *Nakornthai Strip Mill Pub. Co. v. United States*, 614 F. Supp. 2d 1323, 1333-34 (Ct. Int'l Trade 2009). For example, in *Atar, S.r.l. v. United States*, the CIT found that Commerce "having found that the Sale Agreement established the price and quantity terms of a sale," did not err "in concluding that other matters did not constitute essential terms." 637 F. Supp. 2d 1068, 1077 (Ct. Int'l Trade 2009) (finding that "Commerce was not required to accord controlling weight {to a} legal conclusion on

whether the Sale Agreement is enforceable rather than inform Commerce of facts probative on the issue of whether the Sale Agreement established the material terms of sale" *Id.*). Commerce "acts reasonably, and within its authority, in considering a sale or an agreement to sell to exist as of the time when the material terms of sale, *i.e.*, price and quantity, have been established between the foreign producer/exporter and the customer." *Id.* at 1076.  The CAFC has similarly confirmed that "{n}either a sale nor an agreement to sell occurs until there is mutual assent to the material terms (price and quantity)." *Corus Staal BV v. United States*, 502 F.3d 1370, 1376 (Fed. Cir. 2007).

The Department's "decision to use a date of contract methodology, as opposed to its regulatory presumption in favor of date-of-invoice as date of sale" is thus reasonable where the Department "provide{s} a rational explanation as to why the changes in the material terms . . . merited a deviation from its normal date-of-sale analysis." *USEC Inc. v. United States*, 498 F. Supp. 2d 1337, 1348 (Ct. Int'l Trade 2007).

2.      *The Department Has An Established Practice In Determining The Date of Sale*

Though, as detailed above, the Department has discretion and "flexibility" in determining the date of sale, Commerce's findings in previous cases are instructive and establish a general practice with regards to the date of sale.

First, Commerce has regularly found the contract date to be the appropriate date of sale where there are no changes to the major material terms of the sale in the final invoice. In conducting this analysis, Commerce

> has a 'well-established and long-standing practice' of looking beyond the invoice date to the parties' actual course of conduct, as well as the parties' expectations concerning the transaction, to determine whether an earlier date—such as the contract date—represents the point at which the parties reached a meeting of the minds on the material terms of sale.

16

*Nucor*, 612 F. Supp. 2d at 1308. For example, in *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, Commerce stated that it "does not require the use of invoice date if the facts of a case indicate a different date better reflects the time at which the material terms of sale were established." 63 Fed. Reg. 32833, 32835 (Dep't Commerce Jun. 16, 1998) (final AD results) ("*Pipe from Korea*"). Where the material terms of sale are "set on the contract date and any subsequent changes are usually immaterial in nature or, if material, rarely occur," use of the contract date as the date of sale is appropriate. *Id.* at 32836. More recently, in *White Grape Juice Concentrate From Argentina*, Commerce found the contract date to be the appropriate date of sale where the respondent reported that "the material terms of sale were established by the contract and did not change at the invoice date" and the information on the record confirmed that "the material terms of sale remain fixed from the contract date." 87 Fed. Reg. 66269 (Dep't Commerce Nov. 3, 2022) (prelim. affirm. LTFV determ., postponement of final determ., ext. of provisional measures), and accompanying Decision Memorandum at 10 (investigation suspended before final determination issued, *White Grape Juice Concentrate From Argentina: Suspension of Antidumping Duty Investigation*, 88 Fed. Reg. 17808 (Dep't Commerce Mar. 24, 2023). Likewise, in *1,1,1,2-Tetrafluoroethane (R-134a) From the People's Republic of China*, Commerce found the date of contract "better reflects the date on which the material terms of the sale are established than the invoice date" where "the 'material terms of sale did not change once {the respondent} signed the sales contract with the unaffiliated customer." 88 Fed. Reg. 27861 (Dep't Commerce May 3, 2023) (prelim. AD results, partial rescission, and prelim. no shipments determ.; 2021-2022), and accompanying Decision Memorandum at 17 ("*1,1,1,2-Tetrafluoroethane (R-134a) from PRC IDM*"), unchanged in the final results, *1,1,1,2-Tetrafluoroethane (R-134a) From the People's Republic of China*, 88 Fed. Reg. 60639 (Dep't

Commerce Sept. 5, 2023) (final AD results & determ. of no shipments; 2021-2022), and accompanying Issues and Decision Memorandum.

Second, Commerce has considered what is and is not a "material" term of sale on several occasions, and consistently found that changes within the tolerances, *i.e.*, minor changes to the quantity, established in a contract are not material. With regards to quantity, Commerce has repeatedly found that "any differences between the quantity ordered and the quantity shipped which fall within the tolerance specified by the entire contract do not constitute changes in the material terms of sale." *Certain Hot-Rolled Carbon Steel Flat Products From Thailand*, 66 Fed. Reg. 49622 (Dep't Commerce Sept. 28, 2001) (final LTFV determ.), and accompanying Issues and Decision Memorandum at Cmt. 9; *Certain Preserved Mushrooms From the People's Republic of China*, 74 Fed. Reg. 50946, 50949 (Dep't Commerce Oct. 2, 2009) (prelim. AD results of new shipper rev.) (unchanged at final results); *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 71 Fed. Reg. 17810, 17810 (Dep't Commerce Apr. 7, 2006) (prelim. AD results) (unchanged at final results); *Certain Welded Carbon Steel Pipes and Tubes from Thailand*, 66 Fed. Reg. 18901, 18902 (Dep't Commerce Apr. 12, 2001) (prelim. AD results) (unchanged at final results). For example, in *Certain Cut-to-Length Carbon Steel Plate from Romania*, Commerce found that the material terms of sale were set in the order acknowledgement where that document "specifically states that the terms of sale are finalized within a quantity tolerance (*i.e.*, plus or minus 10 percent or one plate), and all but one small sale fell within the tolerance." 72 Fed. Reg. 6522 (Dep't Commerce Feb. 12, 2007) (final AD results & partial rescission) ("*Steel Plate from Romania*"), and accompanying Issues and Decision Memorandum at 7. ("*Steel Plate from Romania IDM*"). The CIT has confirmed that "differences in line item quantities, so long as the overall quantity is within the overall quantity tolerance

level, are not significant," and that "it is Commerce's practice to disregard changes that are not significant" in determining the date of sale. *Nakornthai*, 614 F. Supp. 2d at 1332, 1333 (finding that "the change in aggregate quantity shipped {by respondent} is not, on its own, significant and does not, by itself, materially affect the date that the terms of contract were essentially established." *Id.* at 1329 (citation omitted)). In this context, the CIT explicitly rejected the "hypothetical reasoning" that respondents could "manipulate the 'product mix'" within the overall quantity of a contact such that it would constitute a material change. *Id.* at 1332.

With regards to price, Commerce has similarly found that the "material terms of sale are indeed established in those cases where contract terms allow for price adjustments based on specified published indices . . . because there is nothing more for the parties to negotiate." *Solid Urea from the Russian Federation*, 75 Fed. Reg. 51440 (Dep't Commerce Aug. 20, 2010) (final AD results), and accompanying Issues and Decision Memorandum at 9. For price adjustments made pursuant to such indices, which are "based on outside factors beyond the parties' control and agreed to in a sales contract," use "do{es} not change the date of sale to a later date, because the parties do not retain any discretion to set prices after the date of contract." *Polyethylene Terephthalate Resin From the Sultanate of Oman,* 87 Fed. Reg. 75594 (Dep't Commerce Dec. 9, 2022) (final AD results; 2020-2021), and accompanying Issues and Decision Memorandum at 5 ("*PET Resin from Oman IDM*"). Regarding contracts specifically, Commerce has determined that "the price was fixed on the contract dates" where the price terms were "based on a set formula of published monthly prices for major inputs which were outside either contracting party's control." *Emulsion Styrene-Butadiene Rubber from Mexico*, 64 Fed. Reg. 14872, 14880 (Dep't Commerce Mar. 29, 1999) (final LTFV determ.).

AFDOCS:198838144.1

Third, minor changes to the original contract do not automatically mean the invoice date becomes the proper date of sale.  Indeed, even where there are minor changes to the quantity between the contract and invoice date, Commerce has found that use of an alternate date as the date of sale is appropriate where "no information on the record indicat{es} that the material terms of sale change frequently enough on U.S. sales so as to give both buyers and sellers any expectation that the final terms will differ from those agreed to in the contract."  *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 77 Fed. Reg. 61738 (Dep't Commerce Oct. 11, 2012) (final AD Results), and accompanying Issues and Decision Memorandum at 3 ("*Pipe & Tube from Thailand IDM*") (quoting *Pipe From Korea*, 63 Fed. Reg. at 32836).  For example, in *Steel Plate from Romania*, Commerce accepted the order acknowledgement date, rather than invoice date, as the date of sale based on evidence that quantities and prices were fixed at the date of order acknowledgement, notwithstanding some minor differences between the ordered quantity and the invoiced quantity. *Steel Plate from Romania IDM* at 6-9 (Issue 1). Commerce's finding was premised, in part, on the fact that the buyers and sellers expected that the terms of the sale would not change after the order acknowledgement date. *Id.* at 8 ("{T}he fact that the buyers and sellers had no expectation that the final sales terms would differ from those established in the contract, warrant{s} the use of order acknowledgment date for the date of sale.").  Commerce specifically determined the order acknowledgement date to be the appropriate date of sale because "the order acknowledgement contains terms and conditions of the sale, and states that all parties agree that there can thereafter be no changes in the terms of the sale." *Id.* at 7. Commerce found "the material terms of sale did not undergo any meaningful changes subsequent to the issuance of the order acknowledgment, nor were the order acknowledgments subject to any meaningful changes" where "the quantities were all within the

tolerance levels listed on the order acknowledgment, with the exception of one sale of a small quantity." *Id.*  Likewise, in *Sulfanilic Acid from Portugal*, Commerce found the contract date to be the appropriate date of sale where the parties "intended that price and quantity would be set" in the contract, even though there "were certain subsequent modifications to the original sales contract." 67 Fed. Reg. 60219 (Dep't Commerce Sept. 25, 2002) (final LTFV determ.), and accompanying Issues and Decision Memorandum at 4. Of significance to Commerce was that "the parties acted in a manner consistent with a 'meeting of the minds' to be bound by the terms of the original contract." *Id.* As the CIT has recognized, for Commerce, "'{t}he key element to consider' in determining date of sale is which date best reflects the point at which the parties had a meeting of the minds on the material terms of sale—not whether there is evidence of even a single change in a single material term of a single contract." *Nucor*, 612 F. Supp. 2d at 1307 (citation omitted).

Finally, because the date of sale is a factual determination, Commerce has stated that its findings in one review are not binding on a subsequent review. There is nothing in the regulations to suggest that Commerce can or should rely on a prior segment of a proceeding as determinative in a later segment of a proceeding. *See* 19 C.F.R. § 351.401(i). To the contrary, Commerce must consider the facts put on the record in each case and cannot rely on its prior determinations alone. *See Hyundai Heavy Indus. Co. v. United States*, 332 F. Supp. 3d 1331, 1342 (Ct. Int'l Trade 2018) ("The fact that the records of prior segments did not support a conclusion that certain service-related revenues were separately reportable does not excuse {respondent} from the burden of again establishing, on the record of this review, that such revenues were not separately reportable. . . . {Respondent} may not, however, rely on Commerce's factual conclusions from prior reviews in the instant review because each review is

AFDOCS:198838144.1

separate and based on the record developed before the agency in the review."). Indeed, relying on its determinations in a prior segment would be antithetical to Commerce's longstanding practice of treating each review as an independent, separate proceeding because past practice is not indicative of current sales processes and suggests that a respondent need not report sales date information once a sales process has been established in a prior review. *See Qingdao Sea-Line Trading Co. v. United States,* 766 F.3d 1378, 1385 (Fed. Cir. 2014) ("Our review is limited to the record before Commerce in the particular review proceeding at issue."). For example, in *Steel Plate from Romania*, Commerce rejected arguments that "a change in the date of sale methodology in the current review would be inconsistent with the Department's established practice and findings in the previous review," finding that "the facts in the instant review and the previous review are not identical." *Steel Plate from Romania IDM* at 3, 9. In *Polyethylene Terephthalate Resin From the Sultanate of Oman*, Commerce again confirmed that "date of sale determinations in previous segments of a proceeding are not binding on subsequent segments of the proceeding." *See PET Resin from Oman IDM* at 4.

      B.    <u>Substantial Evidence Supports That U.S. Sales Were Set in the Contract and Did Not Change</u>

In the *Final AD Results*, Commerce again explained that its "practice is that it will use the invoice date as the date of sale in the absence of information indicating that a 'different date better reflects the date on which the exporter or producer establishes the material terms of sale.'" *Final IDM* at 8, P.R. 203 (citation omitted).  However, Commerce then determined for both Kaptan and Çolakoğlu that because the record of this review did not indicate changes to the terms of the companies' respective sales contracts, and because there were changes to the contract prior to the invoice date, Commerce did not rely on contract date as the U.S. date of sale.  Commerce's determination in the *Final AD Results* is flawed on both accounts.  First, as

described at length above, whether the terms of the companies' respective sales contracts changed from the prior review is not the relevant question, it is whether the material terms of sale in the contracts changed before the invoice in this review period. Second, as described below, Commerce's determination that there were changes to the contracts prior to the invoice date is belied by the record for both Kaptan and Çolakoğlu.

  *1.*  *The Material Terms of Kaptan's U.S. Sales Were Set in the Contract and Did Not Change*

  In the *Final AD Results*, Commerce improperly relied on invoice date as the date of sale for U.S. sales.  In support of this decision, Commerce stated that "language included in Kaptan's contracts did not prevent changes from occurring to the material terms of sale after the contract date;" and that "Kaptan's date of sale methodology/sales process remained unchanged" from the previous review period. *Final IDM* at 10, P.R. 203.  Commerce also claimed that using contract date was inappropriate because "Kaptan has: (1) more than one instance of the material terms of sale changing after the contract date; (2) information on the record indicating certain instances of the material terms of sale may change after the contract date; and (3) no information that time lag in this case affects the material terms of sale." *Id.*

  Commerce's *Final AD Results* are inconsistent with its practice and the law, and do not take proper account of the evidence on the record which, as explained below, weighs against each of Commerce's findings.  The record demonstrates that Kaptan's contracts are binding and that there were no changes to the material terms of the contracts after the contract date. Because the invoiced price and overall quantity for all U.S. sales during the POR did not and could not change from the agreed upon terms in the contract, the contract date is the appropriate date of sale.

First, Commerce's findings in the previous review period were premised on the existence of post-contract amendments, which do not exist in the POR at issue.  *See Steel Concrete Reinforcing Bar From the Republic of Turkey*, 87 Fed. Reg. 7118 (Dep't Commerce Feb. 8, 2022) (final AD results & determ. no shipments; 2019-2020), and accompanying Issues and Decision Memorandum at 20.  Although "material terms of sale *may* change between the contract date and the internal order date in the normal course of business," the record evidence in this review demonstrates that those terms "*did not* change during the POR."  Kaptan 2nd Supp. A-C QR at S3-7 (emphasis added), C.R. 253, P.R. 126. Indeed, contrary to Commerce's finding that the "language included in Kaptan's contracts did not prevent changes from occurring to the material terms of sale after the contract date," *Final IDM* at 10, P.R. 203, Kaptan's binding contracts specifically provide that [

           ]  Kaptan 1st Supp. A-C QR at Exh. S1-6, C.R. 170-174, P.R. 88.  As explained above, in the past, Commerce has determined that the order acknowledgement date was the appropriate date of sale where it included language stating that "all parties agree that there can thereafter be no changes in the terms of the sale."  *Steel Plate from Romania IDM* at 7; *see also Borusan*, 426 F. Supp. 3d 1395, 1402-03 (identifying similar contract language that "no changes to the essential terms of sale after the date of the final purchase order" and explaining that "Commerce must focus on when all of the circumstances that indicate no further change was likely and the material terms essentially were set.") (internal quotations omitted).  Here, at the contract date, both parties agreed to certain [

           ].  Kaptan 1st Supp. A-C QR at Exh. S1-6, C.R. 170-174, P.R. 88.  Those parties also agree that [                                                                                    ].  *Id.*  Such changes

were not made in this POR and, thus, there are not instances on this record demonstrating that certain material terms could change.

Commerce also erroneously determined that there was "more than one instance of the material terms of sale changing after the contract date." *Final IDM* at 10, P.R. 203.  In fact, all "material terms of sale, most notably the price and overall quantity, for POR sales were finalized on the date of the contract and did not change between the invoice and {contract} date." Kaptan 1st Supp. A-C QR at S1-5, Exh. S1-6, C.R. 169-174, P.R. 88; Kaptan Sec. C QR at C-18 - C-19, C.R. 81, P.R. 61. In certain cases, [

], but the price and overall quantity set in the contract date for the total sale were *always* consistent with the final invoice, within permissible tolerances, for all POR sales. Kaptan 1st Supp. A-C QR at S1-5 – S1-6 and Exh. S1-6, C.R. 169-174, P.R. 88.  For example, for [

] the price and overall quantity for the total sale covered by those contacts were within the permissible tolerances. *Id.* at S1-5, C.R. 169, P.R. 88.  In addition, with respect to [                                    ], the discrepancy was negligible, immaterial, and "the result of a mistake in the internal order form." Kaptan 2nd Supp. A-C QR at S3-5, C.R. 253-268, P.R. 126.  This inadvertent mistake was an "unusual circumstance;" it was not "an amendment to the original contract, and the customer only accepted this difference because it was *not* a material change to the contract terms." *Id.* The same is true for the only other contract at issue, [                         ]. *Id.* at S3-6.  Any immaterial "excess" quantity was the "result of an inadvertent typing error in the internal order," not an "amendment to the contract terms or the material terms of sale." *Id.*

Any [                    ] to the size breakdown [                              ] are not a material term of the overall contract and are, in fact, not even included within the contract *at all*. *Id.* (noting that [

]).  Like *CWP from Korea* and *Pipe and Tube from Thailand*, Kaptan and the buyer do not "expect the final terms to differ from those agreed." *See Final IDM* at 9, P.R. 203; *see also Pipe & Tube from Thailand IDM* at 3 (quoting *Pipe from Korea*, 63 Fed. Reg. at 32836).

The immateriality of the individual size breakdown is further evidenced by the terms of the letter of credit ("LOC"), which notes that the financing for each contract is dependent on the *total* contract quantity, rather than the individual size breakdown. *Id.* at Exh. S1-6, pp. 51-53, C.R. 171, P.R. 88 (LOC for [                              ]). Even if the Department takes the position that the [                              ] within the contract quantity are relevant, the [                              ] of Kaptan's total U.S. sales quantity and are not indicative of a "pattern of material changes in quantity" during the POR. *See, e.g.*, *Pipe &Tube from Thailand IDM* at 4.

Last, whether "time lag . . . affects the material terms of sale" is not the sole question before Commerce. *Final IDM* at 10, P.R. 203. It was *one* fact reviewed by Commerce. The questions, as described at length above, are whether the material terms changed between contract date and invoice date and whether there is a date better than invoice date on the record. Commerce must consider the circumstances and facts on this record. Here, as demonstrated, the material terms did not change after the contract date and, as such, there is a date better than invoice date on the record. Additionally, it is Commerce's mandate to calculate an accurate dumping margin. Doing so is only possible if Commerce relies on the record evidence.

In short, in this POR, "there were no post-contract amendments," and no post-contract amendments allowed, which would support selecting invoice date as the date of sale for U.S. sales. *See* Kaptan 2nd Supp. A-C QR at S3-4, S3-7, C.R. 253, P.R. 126. Contrary to Commerce's finding that "Kaptan has not demonstrated that the material terms of sale are finalized upon contract date," *Final IDM* at 10, P.R. 203, Kaptan provided sufficient evidence to demonstrate that both parties – Kaptan and the buyer – intended to finalize the material terms of sale at the signing of the contract.

        2.       *The Material Terms of Çolakoğlu's U.S. Sales Were Set in the Contract and Did Not Change*

In the *Final AD Results*, Commerce inappropriately relied on invoice date as the date of sale for U.S. sales. Commerce based its decision on findings that "Çolakoğlu's sales process allowed for changes in the material terms of sale during the previous POR" and that "the variances in quantity" between contract date and invoice date "reported by Çolakoğlu are indicative of a pattern of material changes in quantity." *Final IDM* at 11-12, P.R. 203. Commerce's final results are belied by the record, internally inconsistent, and inconsistent with Commerce's precedent.

As an initial point, Commerce argues that because "Çolakoğlu's sales process does not preclude changes in the material terms of sale between the times of the contract and the invoice," and the sales process did not change since the last review, Commerce has a different baseline in the instant POR. *Id.* at 12. First, Commerce's "baseline" is the analysis as provided by the regulations and Commerce precedent which, as explained above, require Commerce to evaluate the evidentiary record *in each review* to determine whether there is a date of sale better than invoice date. Whether Çolakoğlu's sales process changed is not the issue, and Commerce completely ignored the record evidence in this review demonstrating that there were no changes

to the material terms of sale after the contract date.  The record of the instant review shows that there is a date of sale better than invoice date (*i.e.*, contract date) *because* there were no changes to the material terms of sale after the contract date.  *See 1,1,1,2-tetrafluoroethane (r-134a) from PRC IDM* at 17 (finding contract date was more appropriate because the material terms of sale did not change after the unaffiliated customer and the respondent signed the contract).  In addition, Commerce's findings in the previous POR were premised on information provided in that proceeding, *i.e.*, the record evidence, which showed that Çolakoğlu "provided evidence of such changes in material terms" after contract date. *See Steel Concrete Reinforcing Bar from the Republic of Turkey*, 86 Fed. Reg. 43181 (Dep't Commerce Aug. 6, 2021) (prelim. AD results & determ. no shipments; 2019-2020), and accompanying Issues and Decision Memorandum at 14, unchanged in the *Rebar 19-20 AR.*  In that review, Commerce did not rely on its previous reviews, but specifically determined that "in the absence of information indicating a different date of sale better reflects the date on which the material terms of sale are established," the appropriate date of sale, based on the record evidence, was the invoice date.  *Id.* at 14. Commerce's findings in the previous review are thus not relevant in to the instant POR. *Shenzhen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1285 n.22 (Ct. Int'l Trade 2020) ("A determination must be supported by substantial evidence based on that administrative record.") (citing *Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016)); *see also Hyundai,* 332 F. Supp. 3d at 1342 (supporting the concept that the records of prior segments do not necessarily establish factual conclusions in later segments).

    In this POR, although Çolakoğlu reported that it is *possible* that "material terms *may* change after it receives the purchase orders or emails," *Final IDM* at 6, P.R. 203, Çolakoğlu also provided ample evidence that the material terms indeed did *not* change after the contract date.

*See* Çolakoğlu Sec. C QR at C-7 and C-8, C.R. 58, P.R. 60; Çolakoğlu Supp. A-C QR at S1-5 –
S1-6, C.R. 244, P.R. 122.  This evidentiary showing is what the Department's regulations
require.

Importantly, as Çolakoğlu explained, although "in general, there is also the possibility
that even after the {Sales Order Contract ("SOC")}, there may be changes to the shipment and/or
in the invoice issued . . . *during this period of review*, there have been *no sales* where there were
changes in material sales terms between the time of the SOC and the invoice." Çolakoğlu 2nd
Supp. A-C QR at S3-10 (emphasis added), C.R. 282, P.R. 138. Çolakoğlu's general sales process
should not dictate the Department's date of sale determination *in this review*, particularly where
the record evidence *in this review* demonstrates that the Department should use contract date as
the date of sale for U.S. sales.  *See, e.g., Shenzhen*, 456 F. Supp. 3d at 1285 n.22; *Borusan,* 426
F. Supp. 3d at 1403 (explaining that Commerce must review the date of sale facts on each
record).  During this POR, "there were *no sales* for which the material terms of sale changed
from the original sales contract (Sales Order Contract) and the time of actual shipment."
Çolakoğlu 2nd Supp. A-C QR at S3-10 (emphasis added), C.R. 282, P.R. 138. (emphasis added).
Çolakoğlu's contracts include the "terms of sale, including price and size breakdown, and the
allowed tolerance for quantity upon delivery."  *Id.*

Commerce's reliance on *ArcelorMittal* is also misplaced.  *See Final IDM* at 11-12, P.R.
203 (citing *ArcelorMittal USA LLC v. United States*, 302 F. Supp. 3d 1366, 1370 (Ct. Int'l Trade
2018)).  Commerce first argues that *ArcelorMittal* stands for the proposition that "any party
proposing a date of sale other than the invoice date must demonstrate that the material terms of
sale were firmly and finally established on its proposed date of sale."  *Id*. at 11, citing *Arcelor
Mittal,* 302 F. Supp. 3d at 1370.  This is precisely what Çolakoğlu did.  *See* Çolakoğlu 2nd Supp.

A-C QR at S3-10, Exh. S3-8, C.R. 282-83, P.R. 138.  Commerce has always defined "{m}aterial terms of sale" as "price, quantity, and delivery and payment terms."  *Eregli*, 308 F. Supp. 3d at 1306 (citing *Sahaviriya Steel Indus. Pub. Co. v. United States*, 714 F. Supp. 2d 1263, 1280 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011)).  Then, one page later in its *Final AD Results*, Commerce relies on an extremely specific and inapposite finding in *ArcelorMittal* to reject Çolakoğlu's reporting of contract date as the date of sale. *Final IDM* at 12, P.R. 203. In particular, Commerce relies on a finding related to cold-rolled steel, a different product than the rebar at issue here.  *ArcelorMittal*, 302 F. Supp. 3d at 1370.  Importantly, Commerce relies on a finding where the "quantity tolerances," specifically for one specification "which accounted for a significant portion of the total reported U.S. sales is substantially *outside the weight tolerance specified in the contact*, and thus the quantity term of that contract changed after the date of contract." *Id.* at 1373 (internal quotations omitted) (citation omitted).  Commerce's reliance on "changes between quantities listed in the sales order contracts and quantities listed in the invoices for a given size that exceed the tolerance levels," *Final IDM* at 12, P.R. 203, is not a proper review of the record because parties agree to quantity tolerances with respect to the total order quantity.  None of the quantities identified in Çolakoğlu's contracts changed outside of the agreed upon tolerances.

The material terms set by Çolakoğlu's contracts are precisely the terms which *did not change* after the contract date during this POR.  In other words, the parties *agree* to the material term that there is an allowance "with respect to the *total* weight tolerance which, in most cases is [          ] of the quantity per size." Çolakoğlu 2nd Supp. A-C QR at S3-11 – S3-12, C.R. 282, P.R. 138. Çolakoğlu provided purchase orders and sales order contracts to support this proposition and to demonstrate that the were no changes to the material terms of sale after the

contract date. *Id.* at S3-11 – S3-14, Exh. S3-8, C.R. 282-83, P.R. 138 (providing sample purchase orders, invoices, and related contracts, all demonstrating that there has been no change in material sales terms after the contract date); *see also* Exh. S3-7, C.R. 282, P.R. 138  (providing a comparison between contract and invoice price and quantity, which demonstrates no change from contract to invoice). Indeed, Çolakoğlu's sales order contracts (*i.e.*, "SOCs") are binding and specifically provide that [

] *Id.* at Exh. S3-8 *e.g.* Sample 11 (p. 2 of 4), C.R. 283, P.R. 138. Çolakoğlu's SOCs further provide that [

] *Id. e.g.* Sample 11 (p. 4 of 4). This language mirrors that previously considered by Commerce in *Steel Plate from Romania*, in which Commerce found that the order acknowledgement date was the appropriate date of sale where it included language stating that "all parties agree that there can thereafter be no changes in the terms of the sale."  *Steel Plate from Romania IDM* at 7; *see also Borusan*, 426 F. Supp. 3d 1395, 1402-03 (identifying similar contract language and requiring a fulsome review of the record).

Çolakoğlu has provided at almost three dozen samples to support using contract date as date of sale in this POR. *See* Çolakoğlu 2nd Supp. A-C QR at Exhs. S3-7 and S3-8, C.R. 282-83, P.R. 138. Each sample demonstrates that there were no changes to the material terms of sale or deviations from the sales order contract after the contract date and before the invoice date.  As one example, looking at Sample 1, it is clear that the [

]. *See id.* at

Exh. S3-8. [

]. *Id.* (Sample 1).

Because the invoiced price and overall quantity for all U.S. sales during the POR did not

change outside the tolerances provided in the overall contract quantity, the contract date is the

appropriate date of sale.

      C.     <u>The Department Must Provide a Reasoned Explanation for Any Deviation from its Established Practice</u>

As detailed above, Commerce has a well-established practice regarding date of sale

determinations. Specifically, Commerce considers the facts on the record in each review segment

to determine when the material terms of the sale are established and a "meeting of the minds"

occurred. Despite Commerce's discretion, the reviewing courts have rejected Commerce's

deviation from this established practice as an abuse of discretion. As the reviewing courts have

found, "{o}nce Commerce establishes a course of action, . . . Commerce is obliged to follow it

until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary."

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009); *see also Beardmore v.

Dep't of Agric.*, 761 F.2d 677, 679 (Fed. Cir. 1985) ("{A}n agency's discretion is not

unlimited."). The CIT has specifically acknowledged the bounds of Commerce's discretion in

this area, noting that "{c}ertainly no court in any international trade case . . . has held that

Commerce has 'absolute,' unbridled discretion to apply invoice date as the date of sale across-

the-board, with no regard for the record evidence in a case." *Nucor*, 612 F. Supp. 2d at 1303-04.

CIT precedent confirms that Commerce is not "free to arbitrarily choose to use as the date of sale some date other than the date when the material terms of sale were established." *Id.* "{I}f a particular date is demonstrated to be the date when the material terms of sale were established, Commerce has no discretion to simply ignore that date and choose to use some other date as the date of sale." *Id.* 1304.  In *Nucor*, for example, the CIT rejected Commerce's date of sale analysis were it could not "be squared with the relatively long line of cases in which Commerce . . . determined that proof that material contract terms could (or even did) change nevertheless does not automatically warrant use of invoice date as the date of sale." *Id.* at 1308-09. The CIT specifically found that Commerce's "line of cases illustrates that a change in a material contract term, while relevant, does not end Commerce's date of sale analysis" and thus required Commerce "to undertake a factual analysis of the expectations and conduct of the contracting parties, to ascertain when they reached a true meeting of the minds on the material terms of sale." *Id.* at 1309; *see also Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 31 CIT 1793, 1802 (2007) (finding that Commerce must "explain the rationale" for its date of sale determination where it "pointed to a billing adjustment on one of {respondent's} invoices as proof that the material terms of sale were not established at the time of contract" *Id.* at 1799).

In *Eregli*, the CIT likewise remanded Commerce's determination that the invoice date was the appropriate date of sale where the Department failed to explain why "differences in the material terms of sale between order and sales invoice {dates}' merited selection of the invoice date as the home market date of sale" 308 F. Supp. 3d at 1308  (rejecting the date of sale finding where Commerce did "not explain why the selection of the payment option . . . represents a change to a material term" where "the cash or credit terms have been pre-established" *Id.* at

1309). Of particular significance to the Court was the fact that "there {was} no evidence that terms remained negotiable, or that {respondent's} customers changed their minds and were accommodated by {respondent}" after the order date. *Id.* at 1310. The Court has thus acknowledged that there is a difference between a situation where some details of the sale are left to be filled in within the parameters of the initial agreement, *see id.*, and a situation where one party asks the other party to change the initial agreement and the second party agrees to that change. *Cf. SeAH Steel Corp. v. United States*, 25 CIT 133, 136 n.7 (2001) (sustaining Commerce's reliance on the invoice date when the record demonstrated that respondent permitted a customer to request a different payment term between the contract date and invoice date).

More recently, in *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, the CIT rejected the Department's use of the invoice date as the date of sale where there were no changes to the essential terms of sale after the final purchase order and "none of the material terms could change after the initial purchase order was executed without all parties' consent." 426 F. Supp. 3d at 1403. The CIT specifically took issue with Commerce's failure to "truly grapple with" and "focus on when all of the circumstances that indicate no further change was likely and the material terms essentially were set." *Id.*

Although Commerce states that the contract language "did not prevent changes from occurring to the material terms of sale after the contract date," *see Final IDM* at 10, P.R. 203 (relating to Kaptan), and that Çolakoğlu's sales processes established "during the previous POR provide{} a baseline" for this review, *id.* at 11, this contradicts Commerce precedent upheld by the reviewing courts. The key question in Commerce's date of sale analysis is when the material terms of sale are set.  And, Commerce's analysis must occur based on the factual record in the

instant case.  *See, e.g., Shenzhen*, 456 F. Supp. 3d at 1285 n.22 (requiring that Commerce's

determinations be based on the record specific to that review). Commerce is thus obligated to

conduct a fact-intensive analysis in determining the appropriate date of sale in each case and its

selection must be supported by the facts on the record. Commerce has not done so in this case.

## VI.     CONCLUSION

For the reasons set forth above, Plaintiffs Kaptan Demir Celik Endustrisi ve Ticaret A.S.,

Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. request that this Court:

1. Hold that Commerce's *Final AD Results* were not in accordance with law or were not

   supported by substantial evidence with respect to the date of sale issue set forth

   above;

2. Remand the *Final AD Results* to Commerce with instructions to reconsider the date of

   sale for U.S. sales, recalculating Plaintiffs' AD rates as appropriate; and

3. Grant such additional relief as the Court may deem just and proper.


Respectfully submitted,

**/s/ Leah N. Scarpelli**

Leah N. Scarpelli
Jessica R. DiPietro
Matthew M. Nolan

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC  20006
Tel: (202) 857-6013

*Counsel for Kaptan Demir Celik Endustrisi ve Ticaret A.S., Çolakoğlu Metalurji A.S. & Çolakoğlu Dis Ticaret A.S.*

September 18, 2023

AFDOCS:198838144.1

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiffs' Brief in Support for Their 56.2 Motion for Judgment on the Agency Record filed on September 18, 2023 complies with the word limitation requirement. The word count for Plaintiffs' Brief, as computed by Arent Fox LLP's word processing system is 11,297.


**/s/ Jessica R. DiPietro**
Jessica R. DiPietro

*Counsel for Kaptan Demir Celik Endustrisi ve Ticaret A.S., Çolakoğlu Metalurji A.S. & Çolakoğlu Dis Ticaret A.S.*

AFDOCS:198838144.1