## THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VETICARET A.S., COLAKOGLU METALUJI A.S., and COLAKOGLU DIS TICARET A.S., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) ) |
| Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| REBAR TRADE ACTION COALITION, | ) ) |
| Defendant-Intervenor. | ) ) |

Court No. 23-00059

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA MCCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:
DAVID RICHARDSON
Attorney
U.S. Department of Commerce
Justice Office of the Chief Counsel for Trade
Enforcement and Compliance
Branch 1401 Constitution Avenue, NW
Washington, DC  20230

Sosun Bae
Senior Trial Counsel
U.S. Department of
Civil Division
Commercial Litigation
P.O. Box 480
Ben Franklin Station
Washington, DC  20044

Tel: (202) 305-7568
Fax: (202) 305-2062
Email: Sosun.Bae@usdoj.gov

November 17, 2023                                    Attorneys for Defendant

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

STATEMENT PURSANT TO RULE 56.2 ................................................................... 2

    I.      Administrative Determination Under Review .......................................... 2

    II.    Issue Presented For Review ..................................................................... 2

STATEMENT OF FACTS ........................................................................................ 2

    I.      Initial Administrative Proceedings ......................................................... 2

    II.    Preliminary And Final Results.................................................................. 7

SUMMARY OF THE ARGUMENT ........................................................................ 11

ARGUMENT .......................................................................................................... 12

    I.      Standard Of Review................................................................................ 12

    II.    Commerce's Use Of The Earlier Of The Invoice Date Or Shipping Date As The Date Of Sale For U.S. Sales Is Supported By Substantial Evidence And In Accordance With Law ........................................................ 13

           A.    Relevant Legal Background...................................................... 14

           B.    Commerce's Determination Is Supported By The Record And Consistent With Its Practice And This Court's Case Law ...................... 15

                    1.    The Material Terms Of Sale Could Change After The Contract Date............................................................................. 15

                    2.    The Material Terms Actually Changed After The Contract Date............................................................................. 16

                    3.    Commerce Did Not Violate Its Practice Of Basing Each Segment Of A Proceeding On The Record Of That Segment, And The Administrative Determinations Relied On By Plaintiffs Do Not Support Their Arguments ................................. 19

CONCLUSION......................................................................................................... 22

# TABLE OF AUTHORITIES

**CASES**                                                                                         **PAGE(S)**

*Allied Tube & Conduit Corp. v. United States*,
    127 F. Supp. 2d 207 (Ct. Int'l Trade 2000) ............................................................. 15

*ArcelorMittal USA LLC v. United States*,
    302 F. Supp. 3d 1366 (Ct. Int'l Trade 2018) .................................................... passim

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ............................................................................. 13

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) .............................................................................................. 12

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) .............................................................................................. 12

*Dong-A Steel Co. v. United States*,
    337 F. Supp. 3d 1356 (Ct. Int'l Trade 2018) ........................................................ 13

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
    625 F. Supp. 2d 1339 (Ct. Int'l Trade 2009) ............................................... 9, 10, 16

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ............................................................................. 12

*Nucor Corp., et al., v. United States*,
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ........................................................ 14

*Sahaviriya Steel Indus. Public Co. Ltd. v. United States*,
    714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010) .................................................. 15, 22

*Tianjin Wanhua Co., Ltd. v. United States*,
    253 F. Supp. 3d 1318 (Ct. Int'l Trade 2017) ........................................................ 13

*Toscelik Profil ve sac Endustrici, A.S. v. United States*,
    256 F. Supp. 3d 1260 (Ct. Int'l Trade 2017) ........................................................ 15

*U.S. Steel Corp. v. United States*,
    953 F. Supp. 2d 1332 (Ct. Int'l Trade 2013) ........................................................ 15

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) .............................................................................................. 12

*Yieh Phui Enter. Co. v. United States*,
   791 F. Supp. 2d 1319 (Ct. Int'l Trade 2011) ................................................................. 14

## STATUTES

19 U.S.C. § 1516a(b)(1)(B) ..................................................................................................... 12
19 U.S.C. § 1677b(a)(1)(A) .................................................................................................... 14
Uruguay Round Agreements Act, SAA, 103d Cong. H.R. Doc. 103-316 at 810 (1994), as
   reported in 1994 U.S.C.C.A.N. 4040, 4153 ................................................................... 14

## REGULATIONS

19 C.F.R. § 351.401(i) ............................................................................................................ 14

## ADMINISTRATIVE DETERMINATION

*Antidumping Duties; Countervailing Duties: Final Rule*,
   62 Fed. Reg. 27,296, 27,348-49 (Dep't of Commerce May 19, 1997) ............................ 14

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*,
   63 Fed. Reg. 32,833 (Dep't of Commerce June 16, 1998) ............................................. 21

*Certain Cut-to-Length Carbon Steel Plate from Romania*,
   72 Fed. Reg. 6,522 (Dep't Commerce Feb. 12, 2007) .................................................... 11

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   86 Fed. Reg. 50,034, 50,043 (Dep't of Commerce Sept. 7, 2021)..................................... 2

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
   87 Fed. Reg. 74,975 (Dep't of Commerce Aug. 5, 2022)................................................... 8

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
   88 Fed. Reg. 7943 (Dep't of Commerce Feb. 7, 2023)..................................................... 2

*Tetrafluoroethane (R-134) from the People's Republic of China*,
   88 Fed. Reg. 27,861 (Dep't of Commerce May 3, 2023) ............................................... 21

*Circular Welded Carbon Steel Pipes and Tubes from Thailand*,
   77 Fed. Reg. 61,738 (Dep't of Commerce Oct. 11, 2012)............................................... 21

## THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

_____

|  |  |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VETICARET A.S., COLAKOGLU METALUJI A.S., and COLAKOGLU DIS TICARET A.S., | ) ) ) ) |
|  | ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) ) |
|  | ) |
| Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| REBAR TRADE ACTION COALITION, | ) ) |
| Defendant-Intervenor. | ) ) |

Court No. 23-00059

_____

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the United States Court of International Trade, defendant, the United States, respectfully submits this response to the motion for judgment on the administrative record filed by plaintiffs, Kaptan Demir Celik Endustrisi Ve Ticaret A.S. (Kaptan) and Colakoglu Metalurji A.S. and Colakoglu Dis Ticaret A.S. (Colakoglu).  Plaintiffs contest one aspect of the United States Department of Commerce's (Commerce) final results of the 2020-2021 administrative review of the antidumping duty order cover steel concrete reinforcing bar (rebar) from the Republic of Turkey (Turkey).  Because Commerce's determination is supported

by substantial evidence and in accordance with law, the Court should deny plaintiffs' motion and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

Plaintiffs challenge the final results of the 2020-2021 administrative review of the antidumping duty order covering steel rebar from Turkey.  *See Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 7943 (Dep't of Commerce Feb. 7, 2023) (final results) (P.R. 219), and accompanying Issues and Decision Memorandum (IDM) (P.R. 203).[1] The period of review is July 1, 2020, through June 30, 2021.

### II.   Issue Presented For Review

Whether Commerce's decision to use the earlier of the invoice date or shipment date as the date of sale for both Kaptan and Colakoglu is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF FACTS

### I.    Initial Administrative Proceedings

On September 7, 2021, Commerce published the initiation notice for the 2020-2021 administrative review of the antidumping duty order covering steel rebar bar from Turkey.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 50,034, 50,043 (Dep't of Commerce Sept. 7, 2021) (P.R. 9).  Commerce selected both Kaptan and Colakoglu as mandatory respondents for individual examination.  *See* Respondent Selection Memo at 1 (P.R. 22).

---

[1]  Citations to public documents from the administrative record are identified as "P.R. ___," while citations to confidential record documents are identified as "C.R. ___."

As part of its review, Commerce issued initial questionnaires to Kaptan and Colakoglu. *See* Initial Questionnaires (P.R. 23, 25). As part of the mandatory reporting of sales, the questionnaire requests respondents to report date of sale Section A of the questionnaire identifies the date of sale as the first issue in the sales reporting process, and states:

> The **date of sale** for your sales to the United States and the foreign market is important to Commerce's analysis. It will determine which sales records are reported in response to sections B and C of this questionnaire and the exchange rate used to convert normal value into U.S. dollars. Note, however, that Commerce's criteria for determining date of sale may differ from those that you apply in the normal course of business. A description of Commerce's criteria is included in the Glossary of Terms at Appendix I; please use these criteria in preparing your response to this questionnaire.

Kaptan Questionnaire, at A-8 to 9 (P.R. 23); Colakoglu Questionnaire at A-8 to 9 (P.R. 25) (emphasis in original). The glossary of terms in Appendix I defines the date of sale as follows:

> Because Commerce attempts to compare sales made at the same time, establishing the date of sale is an important part of the dumping analysis. ***Commerce will normally use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, Commerce may use a date other than the date of invoice (e.g., the date of contract in the case of a long-term contract) if satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale (e.g., price, quantity)***. (Section 351.401(i) of the regulations.) If, for any specific sale, the date selected is after the shipment date for that sale, Commerce will use shipment date as the date of sale instead, but only for the sale in question.

*Id.* at I-5 to 6 (emphasis added).

Section B of the questionnaire—which concerns home and third-country sales—explains the significance of the date of sale and states "{b}ecause **contemporaneous sales** must be used to determine **normal value**, the reporting period for these sales depends on the dates of sale for the U.S. sales you report in response to section C of this questionnaire." *Id.* at B-1 (emphasis in

original).  The questionnaire requests the respondent to report the invoice date, date of sale (if

different from the invoice date), and date of shipment.  *Id.* at B-13, B-14.

Section C of the questionnaire—concerning U.S. sales—requires respondents to:

> {r}eport each U.S. sale of merchandise entered for consumption
> during the POR, except: (1) for EP sales, if you do not know the
> entry dates, report each transaction involving merchandise shipped
> during the POR; and (2) for CEP sales made after importation,
> report each transaction that has a **date of sale** within the POR. Do
> not report canceled sales. If you believe there is a reason to report
> your U.S. sales on a different basis, please contact the official in
> charge before doing so.

*Id.* at C-2.  Again, the questionnaire requests the respondent to report the invoice date, date of

sale (if different from the invoice date), and date of shipment.  *Id.* at C-12, C-13.

In their initial questionnaire responses, both Kaptan and Colakoglu argued that, for U.S.

sales, Commerce should consider the date of sale to be the contract date, as there were allegedly

no changes to the material terms of the contracts, and any change in quantity was within contract

tolerances.  *See* Kaptan Section A Questionnaire Response at A-19 (P.R. 38); Colakoglu Section

A Questionnaire Response at A-22 (P.R. 39).  Specifically, for home market sales, both Kaptan

and Colakoglu reported the earlier of the invoice or shipment date as the date of sale.  *See*

Kaptan Section B Questionnaire Response at B-22 (P.R. 58); Colakoglu Section A Questionnaire

Response at A-22 (P.R. 39).   For U.S. sales, both Kaptan and Colakoglu reported the invoice

date, the contract date, and the shipping date.  *See* Kaptan Section C Questionnaire Response at

C-17—C-20 (P.R. 61); Colakoglu Section C Questionnaire Response at C-19, C-20, (P.R. 60).

Both respondents also provided a chart of sample sales as purported support for their position

that the contract date should be used as the date of sale for U.S. sales.  *See* Kaptan Section C

Questionnaire Response at Exh. C-6 (C.R. 85); Colakoglu Section C Questionnaire Response at

Exh. C-6 (C.R. 59).

On February 17, 2022, Commerce issued supplemental questionnaires to both Kaptan and Colakoglu regarding, *inter alia*, the date of sale.  *See* Kaptan A-C Supplemental Questionnaire at 4 (C.R. 156); Colakoglu A-C Supplemental Questionnaire at 3 (P.R. 79).  Of particular relevance to this case, Commerce requested that Kaptan provide additional explanation as to why, given that ██████████████████████████████████████████ ██████████████████████████████████, the material terms of sale did not change between the invoice and contract dates.  Kaptan A-C Supplemental Questionnaire at 4 (C.R. 156).

Kaptan responded that, while ████████████████████████████████████ ████████████████████████████████, the price and overall quantity were within the overall allowable tolerance.  Kaptan A-C Supplemental Questionnaire Response, at SI-5, SI-6, (C.R. 169).  Kaptan further contended that ████████████████ tolerances did not constitute material terms contract and that the ██████████████████████ ██████████████████████████████████████.  *Id*.  Kaptan also claimed that, with regard to the ████████████████████████████ ████████████████████████ that they are not indicative of a pattern of material changes in quantity.  *Id*. at SI-6.  The contracts provided by Kaptan contain ████████████████ ████████████████████████.  *See* Kaptan Supplemental A-C Questionnaire Response at Exh. S1-6 (C.R. 170).

On May 2, 2022, Commerce issued a second supplemental questionnaire to Kaptan, requesting that Kaptan explain:  1) whether the material terms of the contracts can change between the contract date and shipment and, if so, how; 2) whether the contracts can be amended, and if so, explain whether any were amended (and to report such amendments); and 3)

whether there were any changes to line items in which the material terms changed and, if so, report the changes.  *See* Kaptan Second A-C Supplemental Questionnaire at 3-4 (P.R. 111). Commerce noted that, in the prior administrative review, Kaptan had reported that the material terms can change after the contract is signed, and asked Kaptan if it had changed its selling practice between this review and the preceding one.  *Id*. at 3.[2]

In its second supplemental questionnaire response, Kaptan attempted to distinguish the prior review from this one.  *See* Kaptan Second A-C Supplemental Questionnaire Response at S3-4 (C.R. 253).  It acknowledged that, in the earlier review, Commerce found that the contract amendments demonstrated that the material terms of sale were changed up until the invoice, and that, in certain instances, the material terms changed even ***after*** the amendments.  *Id.*  Kaptan claimed, however, that in the current review, the material terms of sale were finalized on the contract date.  *Id*. at S3-4, S3-5.  Regarding the sales that ███████████████████████, Kaptan claimed that the overages were mistakes in Kaptan's order forms, and not contract amendments or material changes.  *Id*. at S3-5, S3-6.  Kaptan conceded that, while it did not believe the material terms of the contract changed after the contract date, "{t}he material terms of the sale may change between the contract date and the internal order date in the normal course of business for Kaptan. . ."  *Id*. at S3-7.

Commerce issued a second supplemental questionnaire to Colakoglu on May 17, 2022, asking the same questions as for Kaptan, namely:  1) explain whether the material terms of the contracts can change between the contract date and shipment and, if so, how; 2) explain whether the contracts can be amended, and if so, explain whether any were amended (and to report such

---

[2]  The page numbering in this questionnaire is incorrect: the first page should be page 1 but is instead page 3.

amendments); and 3) explain whether there were any changes to line items in which the material terms changed and, if so, report the changes.  Colakoglu second A-C Supplemental Questionnaire at 4 (P.R. 121).  As with Kaptan, Commerce pointed out that, in the previous review, Colakoglu had reported that the material terms can change after the contract is signed. *Id.*  Commerce also asked if Colakoglu had changed its selling practice between this review and the prior review and, if so, how Colakoglu's customers were informed of the change. *Id.*

Colakoglu responded, stating that:

> {i}n general, there may be slight changes between when the Sales Order Contract {SOC}is sent by Medtrade and the customer completes the Purchase Order.  In addition, in general, there is also the possibility that even after the SOC, there may be changes to the shipment and/or in the invoice issued.  However, during the period of review, there have been no sales where there were changes in material terms of sale changed from the original sales contract (Sales Order Contract) and the time of shipment. . .

Colakoglu Second Supplemental A-C Questionnaire Response at S3-10, (P.R. 126, C.R. 282).  It also explained that it considered the material terms of sale to be price, size breakdown/product, and quantity and that its weight tolerance is based on the total order quantity.  *Id*. at S3-11, S312.

With its second supplemental response, Colakoglu provided sample sales purchase orders and rebar sales order/contracts which, as examples, identified tolerances ███████████████ ███████████████████████████████████████████████ and a ██████████████ ██████████████████████████████████. *See, e.g.,* Colakoglu Second Supplemental A-C Questionnaire Response, at Exh. S3-8 (C.R. 282).

The Rebar Trade Action Committee (RTAC) (defendant-intervenors in this case) submitted comments in advance of the preliminary results, arguing that using the contract date as the date of sale would create a new and incorrect standard for determining date of sale.  *See* RTAC Comments at 11-18 (C.R. 295).

7

II.   <u>**Preliminary And Final Results**</u>

Commerce published its preliminary results on August 5, 2022.  *See Steel Concrete*

*Reinforcing Bar From the Republic of Turkey*, 87 Fed. Reg. 74,975 (Dep't of Commerce Aug. 5,

2022) (P.R. 154), and accompanying Preliminary Issues and Decision Memorandum (PDM)

(P.R. 155) (preliminary results).  In the preliminary results, Commerce determined that the date

of sale for U.S. sales for both Kaptan and Colakoglu was the invoice date (or shipment date, if

earlier), not the contract date.  PDM at 11-13.

Regarding Kaptan, Commerce explained that "Kaptan provided no information indicating

that its sales process has changed, and Kaptan reported that changes in material terms of sale

may occur following the contract date.  In fact, the evidence on the record indicates that there

were changes to the material terms of sale after the date of the contract."  Thus, Commerce

concluded that the invoice date (or shipment date, if earlier) best reflects when the material terms

of sale are established for Kaptan's U.S. sales.  *Id.* at 12-13 (footnotes omitted).  Commerce

further explained in its preliminary results analysis memorandum that, ██████████ of

Kaptan's sales, certain line items had ██████████████████████████

████████████████████████ Kaptan Preliminary Results Analysis Memorandum at

2-3, (C.R. 305).

Regarding Colakoglu, Commerce explained that, "{a}lthough Colakoglu reported that,

during the POR, there were no changes in the material terms of sale after the sales order date,

Colakoglu provided no information indicating that its sales process has changed; further,

Colakoglu reported that the material terms may change after it receives the purchase orders or

emails."  PDM at 11.  Commerce, therefore, in accordance with its normal practice, and in the

absence of information indicating a different date better reflects the date on which the material

terms of sale are established, used the invoice date as date of sale, except when the shipment date proceeds the invoice date.  *Id.*

In their administrative case brief, Kaptan and Colakoglu argued that Commerce should set the dates of sale as the contract dates.  *See* Respondents Case Brief at 18-28 (C.R. 345).  In doing so, they contended that Commerce relied on a prior segment of the proceeding rather than the evidence on the record of the current review.  *Id*. at 20.

RTAC submitted a rebuttal brief, arguing that neither respondent had provided sufficient evidence to establish that the material terms of sale were fixed as of the contract date.  *See* RTAC Rebuttal Brief at 8-14 (C.R. 348).  Indeed, according to RTAC, the record demonstrated that material terms could, and in certain instances, ***did*** change between the contract date and the invoice date.  *Id*.  Citing this Court's decision in *ArcelorMittal USA LLC v. United States*, 302 F. Supp. 3d 1366, 1370 (Ct. Int'l Trade 2018) (cleaned up), RTAC explained that the burden is on respondents to "demonstrate that the material terms of sale were firmly and finally established on its proposed date of sale."  *Id.* at 9.  RTAC further observed that this Court "has upheld the use of contract date, for example, "absent any record evidence that the material terms of {the respondent's} U.S. sales either changed ***or were subject to change***."  *Id*. (citing *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 625 F. Supp. 2d 1339, 1373 (Ct. Int'l Trade 2009)) (emphasis added in RTAC Rebuttal Brief).

RTAC noted Kaptan's and Colakoglu's admissions that material terms may change between the contract date and the invoice date.  *Id* at 10.  In response to the respondents' objection to Commerce's finding regarding the prior review, RTAC pointed out that the record

of the instant review contained the date of sale information from the prior review[3] and that the respondents had agreed that their sales process had not changed since the prior review.  *Id*. at 12-13.  RTAC also identified, as Commerce did in the preliminary results, certain instances in which the terms of the contract actually changed after the contract date.  *Id*. at 14-15 (identifying ███████ contracts in which ███████████████████████████ in the sale ████████████ ███████████████████████████████).  Finally, RTAC observed that, although Kaptan relied on total contract quantity in arguing for the contract date as the date of sale, this Court has upheld a Commerce determination that there was a change in material terms "where the ████████████████████████████████████████████████ ████████.  *Id*. (citing *ArcelorMittal*, 302 F. Supp. 3d at 1376.

In the final results, Commerce continued to find that the invoice date should serve as the date of sale for both Kaptan and Colakoglu.  *See* IDM at 8-12.  Concerning Kaptan, Commerce pointed out that Kaptan's sales process had not changed since the prior review, in which Kaptan had reported its U.S. date of sale as the earlier of the invoice date or shipping date, and that certain record evidence from that review had been placed on the record in this review.  *Id*. at 8-9.  Commerce also found that: 1) Kaptan had acknowledged that material terms could change after the contract date, 2) there was more than one instance in which material terms ***did*** change after the contract date, and 3) that there was no time lag in this case that would affect the material terms of sale.  *Id*. at 10.

In addition, Commerce addressed Kaptan's reliance on *CTL Plate from Romania*, explaining that its administrative determination in that proceeding was distinguishable for a

---

[3] *See* Kaptan Additional Documents (C.R. 333); Colakoglu Additional Documents (C.R. 336, 337).

number of reasons.  *Id.* (citing *Certain Cut-to-Length Carbon Steel Plate from Romania*, 72 Fed. Reg. 6,522 (Dep't Commerce Feb. 12, 2007), and accompanying IDM at Issue 1).  In *CTL Plate from Romania*, the contract explicitly stated that "the parties agree that there can thereafter be no changes in the terms of sale."  *Id.*  In addition, the respondent in that proceeding had changed its date of sale methodology to reflect a change in sales process and had placed customer affidavits on the record declaring that the contracts were understood as the parties' final agreement on quantities and prices ordered.  *Id.*

Commerce then observed that the quantities of individual products in a sale were set forth in Kaptan's contract and were not, contrary to Kaptan's claim, immaterial.  *Id.* at 10-11 ("product characteristics of rebar products themselves, nor the associated product specific quantities, to be immaterial to the sale; instead, we view this information to be fundamental, and any omission of, or variance in, the product terms or quantity to be material changes.").

Concerning Colakoglu, Commerce determined that, like Kaptan, Colakoglu's sales process had not changed since the prior review—in which Colakoglu had reported its U.S. date of sale as the earlier of the invoice date or shipping date—and that certain record evidence from that review had been placed on the record of the current review.  *Id.* at 11-12.  Commerce also found that Colakoglu had admitted that material terms could change after the contract date, and that there were quantity variances on individual products that went above the tolerances in the contract ███████████████████████████████.  *Id.* at 11. (citing Final Analysis Memorandum for Colakoglu (C.R. 365)).

## SUMMARY OF THE ARGUMENT

Commerce's determination to use the invoice dates, rather than the contract dates, as the date of sale for Kaptan's and Colakoglu's sales is supported by substantial evidence, in

accordance with law, and consistent with Commerce's past practice.  By regulation, Commerce

will normally use the date of invoice as the date of sale, and plaintiffs have not established that

Commerce should depart from that default.  Indeed, record evidence supports that the material

terms could (and in some instances, did) change after the contract date.  Plaintiffs' reliance on

certain other administrative determinations is unavailing because those proceedings are factually

distinguishable; as plaintiffs themselves point out, Commerce conducts its date of sale analysis

on a case-by-case.  In addition, Commerce did not deviate from established practice or place

unwarranted reliance on a previous segment of the underlying proceeding; rather, it explained the

relevance of the prior review and noted that certain documents from that review were also on the

record of the instant review.

<p align="center"><b><u>ARGUMENT</u></b></p>

**I.**     **<u>Standard Of Review</u>**

This Court sustains any determination, finding, or conclusion by Commerce unless it is

unsupported by substantial evidence, or otherwise not in accordance with law.  19 U.S.C.

§ 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial

evidence" means "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial

evidence may be "less than the weight of the evidence," and the possibility of drawing

inconsistent conclusions from the record does not make Commerce's findings unsupported by

substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Thus, a party

challenging Commerce's determination under the substantial evidence standard "has chosen a

course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352

(Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains

<p align="center">12</p>

Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## II.     Commerce's Use Of The Earlier Of The Invoice Date Or Shipping Date As The Date Of Sale For U.S. Sales Is Supported By Substantial Evidence And In Accordance With Law

Substantial evidence supports Commerce's conclusion that the date of sale for both Kaptan's and Colakoglu's U.S. sales should be the invoice date.  Significantly, both companies reported that, as a general matter, the material terms could change between the contract and the invoice dates.  IDM at 10-11.  This alone clearly establishes that the parties did not have a "meeting of the minds" regarding the material terms of sale as of the contract date.  *See Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1364 (Ct. Int'l Trade 2018) (describing a meeting of the minds as an important factor and holding that the invoice and shipment dates better reflected a meeting of the minds than the purchase order date).  Both Kaptan and Colakoglu also reported that their sales practices had not changed since the prior review, in which they stated that the invoice date should be the date of sale, and both had ***actual*** sales in which the ███████████████████████████████████████ set forth in the contracts.  *Id.* at 9-12.  Furthermore, the cases and administrative determinations cited by plaintiffs do not dictate, or even suggest, a finding in their favor.  Although plaintiffs maintain that Commerce erred, they cannot establish that the contract date is the "one and only reasonable" option based on the record, particularly given that the regulatory default for the date of sale is the date of invoice.  *Tianjin Wanhua Co., Ltd. v. United States*, 253 F. Supp. 3d 1318, 1328 (Ct. Int'l Trade 2017).  Indeed, the invoice date is the far more reasonable date.  Accordingly, the Court should sustain Commerce's final results.

13

A.    <u>**Relevant Legal Background**</u>

The relevant statute provides that, in making a dumping comparison, the normal value sales "shall be . . . at a time reasonably corresponding to the time of the . . ." U.S. sales, but does not further define how Commerce should determine the date of sale. 19 U.S.C. § 1677b(a)(1)(A). However, the Statement of Administrative Action (SAA) which accompanies the statute, provides that the date of sale is the "date when the material terms of sale are established." Uruguay Round Agreements Act, SAA, 103d Cong. H.R. Doc. 103-316 at 810 (1994), *as reported in* 1994 U.S.C.C.A.N. 4040, 4153.

Commerce's regulations define the date of sale for both U.S. sales and comparison market sales by establishing a presumption that the date of sale will "normally" be the invoice date. *See* 19 C.F.R. § 351.401(i).  A respondent proposing a date of sale other than the invoice date must demonstrate that the material terms of sale were "firmly" and "finally" established on its proposed date of sale. *Antidumping Duties; Countervailing Duties: Final Rule,* 62 Fed. Reg. 27,296, 27,348-49 (Dep't of Commerce May 19, 1997) (*Preamble*); *see also Yieh Phui Enter. Co. v. United States*, 791 F. Supp. 2d 1319, 1322-24 (Ct. Int'l Trade 2011).  Two of the primary material terms of sale are price and quantity.  *Nucor Corp., et al., v. United States*, 612 F. Supp. 2d 1264, 1312-1313 (Ct. Int'l Trade 2009).  The parties to a contract must reach a "meeting of the minds" regarding the material terms of sale in order to depart from the invoice date presumption and use the contract or purchase order date as the date of sale.  *See id.* at 1300 (citing *Preamble*, 62 Fed. Reg. 27,349)).

This standard for determining date of sale "squarely plac{e} the burden on interested parties challenging the presumptive invoice date, to remove any doubt about when material terms are firmly and finally set, so that a reasonable mind has one, and only one, date of sale choice."

14

*Toscelik Profil ve sac Endustrici, A.S. v. United States*, 256 F. Supp. 3d 1260, 1263 (Ct. Int'l Trade 2017) (citing *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 220 (Ct. Int'l Trade 2000) ("Plaintiff, therefore, must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its {date of sale} as the only reasonable outcome.")).

Whether there were material changes to Kaptan's and Colajoglu's sales between the contract and the invoice date is a factual question. *See U.S. Steel Corp. v. United States*, 953 F. Supp. 2d 1332, 1340 (Ct. Int'l Trade 2013). "In choosing a date of sale, Commerce weighs the evidence presented and determines the significance of any changes to the terms of sale involved." *Sahaviriya Steel Indus. Public Co. Ltd. v. United States*, 714 F. Supp. 2d 1263, 1280 (Ct. Int'l Trade 2010).

**B.    Commerce's Determination Is Supported By The Record And Consistent With Its Practice And This Court's Case Law**

**1.    The Material Terms Of Sale Could Change After The Contract Date**

In responding to Commerce's date of sale questions, both Kaptan and Colakoglu admitted that the material terms of sale can change between the contract date and the invoice date.  IDM, at 10-11.  Kaptan explicitly stated that "[t]he material terms of the sale may change between the contract date and the internal order date *in the normal course of business* for Kaptan. . ."  Kaptan Second A-C Supplemental Questionnaire Response at S3-7 (P.R. 126) (emphasis added).  Colakoglu similarly stated that, "{i}n general, there may be slight changes between when the Sales Order Contract is sent by Medtrade and the customer completes the Purchase Order.  In addition, in general, there is also the possibility that even after the SOC, there may be changes to the shipment and/or in the invoice issues."  Colakoglu Second Supplemental A-C Questionnaire Response at S3-10 (P.R. 138, C.R. 282).  These concessions alone constitute

substantial evidence supporting Commerce's determination, as it is clear that Kaptan and Colakoglu considered that the material terms of the sale could change after the contract date, meaning no meeting of the minds occurred.

Plaintiffs attempt to overcome this significant, unopposed factual finding by arguing that, during the underlying period of review, there were no *actual* changes in material terms between contract date and invoice or shipping date. *See, e.g.,* Pls. Br. at 2-3, 23. This argument both mischaracterizes the prevailing standard and is belied by the record.

First, as noted above, if the material terms are not generally considered to be set until the invoice or shipping date, whether changes actually occur is inconsequential. Put another way, if the material terms *may* change up until the earlier of the shipment or invoice date then, they are not set at the contract date, as no meeting of the minds has occurred. Indeed, this Court has countenanced Commerce's decision to rely on the contract date as the date of sale when, "absent any record evidence that the material terms of {the respondent's} U.S. sales either had changed *or were subject to change*." *Habas Sinai,* 625 F. Supp. 2d at 1373 (Ct. Int'l Trade 2009) (emphasis added). Thus, even assuming, *arguendo*, that no material terms actually changed between the contract date and the invoice date, plaintiffs' explicit concessions that the material terms could change after the contract date precludes a finding that the material terms of the sale were fixed at the contract date.

## 2.    <u>The Material Terms Actually Changed After The Contract Date</u>

Even if the Court accepts plaintiffs' theory, Commerce found not only that the material terms were not fixed as of the contract date, but that the material terms *actually* changed between the contract date and invoice or shipping date. *See* IDM at 10, 12. Specifically, Commerce examined the sales data for Kaptan and Colakoglu and found instances in which the sales

quantities for ███████████████████████████████████████████ in

the contract.  *See* Kaptan Preliminary Results Analysis Memorandum at 2-3 (C.R. 305);

Colakoglu Final Analysis Memorandum, Cmt. 1, at 2 (C.R. 365).[4]

      Plaintiffs claim that the data showing Kaptan's exceeding of the contractual tolerances

was the result of an inadvertent mistake.  *See* Pls. Br. at 25.  But no record evidence supports

Kaptan's contention that the sales differences were based on typos or other inadvertent mistakes;

the record shows only that there is a quantity difference between the contract date and the

internal order form.

      Plaintiffs also argue that Commerce should only rely on the overall quantity tolerances,

and not the individual product quantity tolerances, because the excesses found therein are

"immaterial" and should not matter so long as the total quality tolerance is not exceeded.  Pls. Br.

at 25, 26.  But, as Commerce explained, tolerances for size breakdowns of products are material

terms of sale.  IDM at 12.  Indeed, individual product tolerances are included in the sales

documents ***because*** the customer does not want significantly more or less than it ordered with

regard to a particular product specification.

      In *ArcelorMittal,* this Court sustained Commerce's decision to use the invoice date over

the contract date, stating that:

> integrated mill specification sheets, due to their precision regarding
> qualities of the specifications and the quantity tolerance relevant to
> each specification therein, are crucial to the "firm{}" and "final{}"
> establishment of the material terms of sale—specifically, the

---

[4]  Kaptan had ███████████████████████████████████████████
███████.  *See, e.g.,* Kaptan Supplemental A-C Questionnaire Response at Exh. S1-6 (C.R.
170).  Colakoglu's data showed tolerances ███████████████████████████████████████████
███████████████████ and a ███████████████████████████████████████████
███████████.  *See* Colakoglu Second Supplemental A-C Questionnaire Response at Exh. (C.R.
282).

> material term of quantity. . . . As Commerce found, the material term of quantity for at least one specification changed between the date of contract and the corresponding date of invoice.

*ArcelorMittal*, 302 F. Supp. 3d at 1376.  Plaintiffs claim that *ArcelorMittal* is inapposite because it involved a finding that a significant proportion of the total sales were outside the weight tolerances.  Pls. Br. at 30.  This purported distinction does not undermine the proposition in *ArcelorMittal* that product specifications are material terms of a sale.  As an example, if a sales contract was for a total quantity of 100,000 pounds of rebar, calling for four different sizes of rebar at 25,000 pounds per size, but the seller delivered zero rebar for three of the sizes and 100,000 pounds for one size of rebar, that would clearly constitute a significant deviation in quantity of individual products from the original contract terms.[5]  While this may be an extreme example, it illustrates the point that, if the quantity of individual products is outside the quantity tolerances for individual products, the customer is not getting what it expects (which is an amount within the contractual quantity tolerances).

Under plaintiffs' suggested standard, respondents would be entitled to completely shift the individual product mix in a sale and claim that no material term of the contract changed—an absurd outcome.  Customers order a particular product mix, and presumably believe that, if the material terms of the contract are not subject to change, they will receive both the total amount ordered and the individual product mixes within the contractually stated tolerances.  Commerce's finding that individual product sizes and tolerances are material is reasonable; plaintiffs' suggestion is not.

---

[5]  The ████████████████████████████████████.  Colakoglu Final Analysis Memorandum, Cmt. 1 at 2 (C.R. 365).  For Kaptan, ███████████████████████████████████████████████████████.  Kaptan's Final Calculation Memorandum at 2-3 (C.R. 305).

Plaintiffs additionally claim that the ████████████████████ are ████ and so should not be considered. Pls. Br. at 26. But again, they are ████████ ████████████ in the contracts. Accordingly, Commerce correctly found "this information to be fundamental, and any omission of, or variance in, the product terms or quantity to be material changes." IDM at 11.

Finally, plaintiffs point to the terms of a letter of credit, in arguing for the immateriality of the individual size breakdown. Pls. Br. at 26. But they provide no rationale as to why the letter of credit should have anything to do with Commerce's date of sale analysis. The concerns underlying the issuance of a letter of credit are not on the record of this proceeding and, in any event, are unlikely to be the same or similar concerns considered by Commerce in a date of sale analysis.

### 3. Commerce Did Not Violate Its Practice Of Basing Each Segment Of A Proceeding On The Record Of That Segment, And The Administrative Determinations Relied On By Plaintiffs Do Not Support Their Arguments

Commerce's determination was supported, in part, by its unrebutted findings that neither Kaptan nor Colakoglu had changed their sales practices from the prior review, and that both companies had reported the earlier of the shipping or invoice dates as the date of sale for their U.S. sales. IDM at 9, 12. Plaintiffs allege that Commerce acted improperly by relying on facts from a prior review because its decisions should stand on the record or each segment of a proceeding. Pls. Br. at 27-28. This argument fails.

First, Commerce actually placed information about both Kaptan's and Colakoglu's sales process and date of sale reports from the prior review on the record of this review; accordingly, the information **was on the record of this review**. IDM at 9, 12; *see also* Kaptan Additional Documents (C.R. 333); Colakoglu Additional Documents (C.R. 336, 337). Commerce also

found that there had been no changes in either company's sales processes between the two reviews that would justify changing the date of sale.  IDM at 9, 12.  Given that Kaptan and Colakoglu conceded in both the prior review and the underlying one that the material terms of sale could change, and that material terms actually did change subsequent to the contract date, the record evidence from the prior review, which is on the record of this review, constitutes additional evidence that they did not consider the material terms of sale to be fixed at the contract date during this period of review.

Plaintiffs also claim that the prior review is distinguishable because, in that review, there were post-contract amendments, whereas there are none on the record of this review.  Pls. Br. at 24.  But even if there were no formal post-contract amendments, the record of this review demonstrates that there were still post-contract changes for both companies during the period of review.  Thus, the situation in the prior review is analogous and further supports Commerce's finding that Kaptan and Colakoglu have considered the material terms to be changeable after the contract.

Plaintiffs rely on *CTL Plate from Romania* in arguing that the contractual language stating that ███████████████████████████████████████████████████████ ██████  supports a finding that the material terms are set in the contract.  *Id*. at 24, 30-31.  But, as Commerce explained, there are significant factual differences between the facts in *CTL Plate from Romania* and this case.  First, the contract at issue in *CTL Plate from Romania* provided that "all parties agree that there can thereafter be no changes in the terms of the sale."  IDM at 10 (citing *CTL Plate from Romania* IDM at Issue 1).  This stands in stark contrast to the contractual language in this case, which ██████████████████████████████████.  Moreover, in *CTL Plate from Romania*, the record contained affidavits from the customers that the terms were

20

material terms fixed in the contract, Commerce conducted a verification, and the respondent in

that case had changed its sales practices.  IDM at 10.  None of these factors are present here.

And, again, the record of this review demonstrates that, for both Kaptan and Colakoglu, there

were material changes in the individual product quantities.

Plaintiffs contend that Commerce has found the date of sale to be the contract date when

there were no changes to the material terms of sale.  Pls. Br. at 27-28 (citing *1,1,1,2-*

*Tetrafluoroethane (R-134) from the People's Republic of China*, 88 Fed. Reg. 27,861 (Dep't of

Commerce May 3, 2023) (preliminary results), and accompanying issues and decision

memorandum at17).  But plaintiffs fail to acknowledge that, here, both Kaptan and Colakoglu

admitted that that the material terms can change after the contract date, and they do not claim

that a similar type of admission was also present in *1,1,1,2-Tetrafluoroethane from China*.

Plaintiffs also cite Commerce's determinations in *Circular Welded Non-Alloy Steel Pipe*

*from the Republic of Korea*, 63 Fed. Reg. 32,833 (Dep't of Commerce June 16, 1998), and

*Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 77 Fed. Reg. 61,738 (Dep't of

Commerce Oct. 11, 2012), for the proposition that, when there are minor changes to quantity

after the contract date, Commerce has found use of the contract date appropriate where the seller

and the buyer "do not expect the final terms to differ from those agreed."  Pls. Br. at 20, 26.

While that general proposition is correct, the facts in ***this*** case do not support such a finding, as

the changes in the underlying proceeding exceeded the allowable contract tolerances and

plaintiffs have admitted that the material terms could change after the contract date.

In short, and contrary to plaintiffs' allegations, *see* Pls. Br. at 32-35, Commerce did not

deviate from its established practice.  Respondents Brief, 32-35.  It analyzed the facts of this

record, which included information from a previous review, and found that the material terms

21

were not set in the contract and that, in any event, the material terms actually changed after the contract date.  In other words, it "weigh{ed} the evidence presented and determine{d} the significance of any changes to the terms of sale involved."  *Sahaviriya Steel Indus. Public Co. Ltd. v. United States*, 714 F. Supp. 2d 1263, 1280 (Ct. Int'l Trade 2010).  Commerce also addressed the administrative determinations relied on by Kaptan and Colakoglu and explained that the factual circumstances in those determinations are distinguishable from those here. Commerce's decision is supported by substantial record evidence and in accordance with law.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's final results and deny plaintiffs' motion.

<div style="margin-left:50%">

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA MCCARTHY
Director

s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

</div>

OF COUNSEL:                                               s/Sosun Bae

| | |
|---|---|
| OF COUNSEL: | s/Sosun Bae |
| DAVID RICHARDSON | Sosun Bae |
| Attorney | Senior Trial Counsel |
| U.S. Department of Commerce | U.S. Department of Justice |
| Office of the Chief Counsel for Trade | Civil Division |
|     Enforcement and Compliance | Commercial Litigation Branch |
| 1401 Constitution Avenue, NW | PO Box 480 |
| Washington, DC  20230 | Ben Franklin Station |
| | Washington, DC  20044 |
| | Tel: (202) 305-7568 |
| | Fax: (202) 305-2062 |
| | Email: Sosun.Bae@usdoj.gov |
| | |
| November 17, 2023 | Attorneys for Defendant |

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,613 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/Sosun Bae</u>
Sosun Bae

**THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

_____
                                                                )
KAPTAN DEMIR CELIK ENDUSTRISI                )
VETICARET A.S., COLAKOGLU                         )
METALUJI A.S., and COLAKOGLU DIS              )
TICARET A.S.,                                                   )
                                                                )
               Plaintiffs,                                        )
                                                                )
       and                                                       )
                                                                )
ICDAS CELIK ENERJI TERSANE VE               )
ULASIM SANAYI, A.S.,                                    )        Court No. 23-00059
                                                                )
               Plaintiff-Intervenor,                           )
                                                                )
       v.                                                          )
                                                                )
UNITED STATES,                                            )
                                                                )
               Defendant,                                      )
                                                                )
REBAR TRADE ACTION COALITION,              )
                                                                )
               Defendant-Intervenor.                       )
_____ )

## <u>ORDER</u>

Upon consideration of plaintiffs' motions for judgment upon the agency record,

defendant's and defendant-intervenor's responses thereto, plaintiffs' replies, the administrative

record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is

further

ORDERED that judgment is entered in favor of the United States.

Dated:_____                    _____
        New York, New York                    JUDGE