Slip Op. 24-39

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., COLAKOGLU METALUJI A.S., AND COLAKOGLU DIS TICARET A.S., <br><br> Plaintiffs, <br><br> ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> REBAR TRADE ACTION COALITION, <br><br> Defendant-Intervenor. | Before: Jane A. Restani, Judge <br><br> Court No. 23-00059 |

### OPINION AND ORDER

[Commerce's Final Results in the Administrative Review of Commerce's antidumping duty order on steel concrete reinforcing bar from Turkey are sustained.]

Dated: April 4, 2024

Leah N. Scarpelli and Jessica DiPietro, ArentFox Schiff LLP, of Washington, DC, argued for plaintiffs Kaptan Demir Celik Endustrisi ve Ticaret A.S., Colakoglu Dis Ticaret A.S., Colakoglu Metalurji A.S., and plaintiff-intervenor ICDAS Celik Enerji Tersane Ve Ulasim Sanayi, A.S. With them on the brief was Matthew M. Nolan.

Sosun Bae, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for the defendant. With her on the brief was Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and L. Misha Preheim, Assistant Director. Of counsel on the brief was David W. Richardson, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Maureen E. Thorson, Wiley Rein, LLP, of Washington, DC, argued for defendant-intervenor Rebar Trade Action Coalition. With her on the brief was John R. Shane and Alan H. Price.

Restani, Judge: This action is a challenge to the final results made by the United States Department of Commerce ("Commerce") in the administrative review of the antidumping duty ("AD") order on steel concrete reinforcing bar ("rebar") from the Republic of Turkey covering the period from July 1, 2020, through June 30, 2021. Plaintiffs and Plaintiff-Intervenor[1] request the court hold that Commerce's decision to use the invoice date as the date of sale for sales of subject merchandise to the U.S. market is unsupported by substantial evidence.[2] The United States ("Government") and the Rebar Trade Action Coalition ("RTAC") ask that the court sustain Commerce's final results.

## BACKGROUND

Commerce published an antidumping duty order on steel concrete reinforcing bar from the Republic of Turkey on May 22, 2017. See Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Determination of Sales at Less than Fair Value, 82 Fed. Reg. 23192 (Dep't Commerce May 22, 2017). In September 2021, Commerce initiated an administrative review of

---

[1] Plaintiff Intervenor ICDAS Celik Enerji Tersane Ve Ulasim Sanayi, A.S. ("Icdas") was not a mandatory respondent in this review but was a foreign producer subject to the "all others" rate assigned by Commerce in the final results. Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021, 88 Fed. Reg. 7941 (Dep't Commerce Feb. 7, 2023). In its 56.2 motion, Icdas adopted and incorporated all arguments related to date of sale as filed by the plaintiffs to the extent they impact the determination of the all-others' rate. Plaintiff-Intervenor Icdas Celik Enerji Tersane Ve Ulasim Sanayi, A.S.'s Mem. of L. in Supp. of Mot. for J. on the Agency Record at 3, ECF No. 32 (Sept. 18, 2023). Icdas made no unique arguments relating to date of sale. See generally, id.

[2] In the complaint, plaintiffs also challenged Commerce's treatment of Section 232 tariffs. Compl. at ¶ 34, ECF No. 8 (Apr. 10, 2023). In their brief, plaintiffs notified the court that although they still argue Commerce's determination is not based on substantial evidence, they concede that their appeal is now foreclosed by the Federal Circuit's decision in Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States. 63 F.4th 25, 37 (Fed. Cir. 2023); Pls.' Br. in Supp. of Mot. for J. on the Agency R. Pursuant to Rule 56.2 at 3, ECF Nos. 33–34 (Sept. 19, 2023).

this order, covering the period from July 1, 2020, through June 30, 2021. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 86 Fed. Reg. 50034 (Dep't Commerce Sept. 7, 2021). Commerce selected Colakoglu Metalurji A.S. ("Colakoglu") and Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") as mandatory respondents in this review. Respondent Selection Memorandum at 1, C.R. 3, P.R. 22 (Sept. 29, 2021).

Commerce published its preliminary results on August 5, 2022. See Steel Concrete Reinforcing Bar From the Republic of Turkey, 87 Fed. Reg. 47975 (Dep't Commerce Aug. 5, 2022), and accompanying Preliminary Decision Memorandum Issues and Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review: Steel Concrete Reinforcing Bar from the Republic of Turkey; 2020-2021, A-489-829, POR 07/01/2020-06/30/2021 (Dep't Commerce July 29, 2022) ("PDM"). For both Colakoglu's and Kaptan's U.S. market calculation, although Colakoglu and Kaptan reported their date of sale as the contract date, Commerce used the invoice date as the date of sale. PDM at 11–12. Kaptan and Colakoglu (collectively, "Respondents") submitted a joint case brief to Commerce challenging Commerce's use of the invoice date. See generally Turkish Respondents' Case Brief, C.R. 345, P.R. 190 (Sept. 13, 2022).

Commerce published its final results on February 7, 2023. Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021, 88 Fed. Reg. 7941 (Dep't Commerce Feb. 7, 2023), and accompanying Issues and Decision Memorandum of the Final Results of the Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from Turkey; 2020-2021, A-489-829, POR 07/01/2020-06/30/2021 (Dep't Commerce Feb. 1, 2023) ("IDM"). In the results, Commerce continued to find that the invoice date should serve as the date

of sale for Respondents despite the arguments in the case briefs. See IDM at 8–12.

Commerce primarily relied on three factors to make its determination. First, that no changes had occurred to Respondents' sales process since the previous review where the invoice date was selected as the date of sale. IDM at 9, 11. Second, that their contracts allowed for changes to be made to material terms after the contract date. PDM at 11; IDM at 9, 11. Third, that actual changes occurred and there were no mitigating factors to excuse such changes.[3] IDM at 9–10, 12.

On April 10, 2023, Respondents commenced the instant action against the United States pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i) and 1516a(a)(2)(B)(iii). Compl., ECF No. 8 (Apr. 10, 2023). Respondents claim that the final results are unsupported by substantial evidence or are otherwise contrary to law because Commerce used the invoice date as the date of sale for the U.S. market when no material changes were made after the contract date. Id. at ¶¶ 30–31. Respondents contend that each of the three prongs Commerce relied upon to make its determination were unsupported by substantial evidence and are contrary to Commerce's pattern and practice. Id.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). The court sustains Commerce's determinations in antidumping proceedings unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[3] In the IDM, Commerce distinguishes other reviews where Commerce used the contract date despite changes to the material terms occurring after the contract date. IDM at 9. The two examples of factors referenced by Commerce include reviews where record evidence indicates that said changes were "usually immaterial, or if material, rarely occur" and when there is a "long lag time between the contract and invoice/shipment date." Id.

## DISCUSSION

I. **Legal Standard**

The parties agree on the broad strokes of the law governing this case. In an antidumping review, Commerce must conduct a "fair comparison" of the prices for a good sold in the respondent companies' home market ("normal value") with the prices that they charge for the same or similar good in the U.S. market ("export price") to determine whether the good is being, or is likely to be, sold at less than fair value. See 19 U.S.C. § 1677b(a); see also Smith-Corona Grp. v. United States, 713 F.2d 1568, 1577–78 (Fed. Cir. 1983). The normal value must be from "a time reasonably corresponding to the time of sale used to determine the export price," leading Commerce to identify a specific date on which the sale occurred. 19 U.S.C. § 1677b(a)(1)(A). Commerce's regulations on the matter provide that:

> In identifying the date of sale of the subject merchandise or foreign like product, [Commerce] normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, [Commerce] may use a date other than the date of invoice if [Commerce] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

19 C.F.R. § 351.401(i) (2020). Thus, under ordinary circumstances, the date of sale regulation "establishes a 'rebuttable presumption' in favor of the invoice date unless the proponent of a different date produces satisfactory evidence that the material terms of sale were established on that alternate date." Eregli Demir ve Çelik Fabrikalari T.A.S. v. United States, 308 F. Supp. 3d 1297, 1306 (CIT 2018) (citations omitted).

The material terms generally include the terms of price, quantity, payment, and delivery. Id. at 1306–07 (citing Sahaviriya Steel Industries Public Co. Ltd. v. United States, 34 CIT 709, 727, 714 F. Supp. 2d 1263, 1280 (2010), aff'd, 649 F.3d 1371 (Fed. Cir. 2011)). The preamble to the regulation explicitly contemplates situations where quantity or price change, explaining that:

> as a matter of commercial reality, the date on which the terms of a sale are first agreed is not necessarily the date on which those terms are finally established. In [Commerce's] experience, price and quantity are often subject to continued negotiation between the buyer and the seller until a sale is invoiced. The existence of an enforceable sales agreement between the buyer and the seller does not alter the fact that, as a practical matter, customers frequently change their minds and sellers are responsive to those changes. [Commerce] also has found that in many industries even though a buyer and seller may initially agree on the terms of a sale, those terms remain negotiable and are not fully established until the sale is invoiced.
> . . .
> If [Commerce] is presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of the invoice, [Commerce] will use that alternative date as the date of sale. . . . However, [Commerce] emphasizes that in these situations, the terms of sale must be firmly established and not merely proposed. A preliminary agreement on terms, even if reduced to writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly "established" in the minds of the buyer and seller. This holds even if, for a particular sale, the terms were not renegotiated.

62 Fed. Reg. 27,296, 27,348–49 (Dep't Commerce May 19, 1997) ("Preamble"). Accordingly, a party proposing a date other than the invoice date must not only show that the administrative record as a whole demonstrates that the material terms were "finally" and "firmly" established on that date, but also that none of the scenarios explicitly labeled as insufficient by Commerce in the Preamble are applicable. See Yieh Phui Enterprise Co. v. United States, 35 CIT 1122, 1125–28, 791 F. Supp. 2d 1319, 1322–25 (2011). In the light of this, the question here is whether the evidence relied upon by Respondents supports using the contract date rather than the invoice date as the date of sale.

## II.     Commerce's use of the invoice date as the date of sale is supported by substantial evidence

Respondents reported in their initial questionnaires that the material terms of sale were established on the contract date. Kaptan's Response to the Department's Section A Questionnaire at A-19, C.R. 4–11, P.R. 38 (Oct. 29, 2021); Colakoglu's Response to the Department's Section A Questionnaire at A-22, C.R. 15–26, P.R. 39–44 (Oct. 29, 2021). Commerce, however, found

that the administrative record as a whole did not rebut the presumption in favor of using the invoice date and that the material terms were not established until the invoice date. See PDM at 10–12; see also IDM at 8–12. To make this determination, Commerce relied on the fact that Respondents reported no changes to their sales processes since the prior review; that terms in the contracts allowed for changes in quantity after the contract date; and that actual changes occurred after the contract date. IDM at 8–12. The court addresses each of these considerations in turn.

      a. **Evidence from prior administrative reviews support the use of the invoice date as the date of sale**

Respondents argue that Commerce's reliance on information from its previous review was inappropriate as Commerce must "evaluate the evidentiary record in each review . . . ." Pls.' Br. in Supp. of Mot. for J. on the Agency R. Pursuant to Rule 56.2 at 27, ECF Nos. 33–34 (Sept. 19, 2023) ("Resp't Br.") (emphasis omitted). The Government asserts that by placing the Respondents' information on date of sale from the prior review on the record, that information is considered part of the evidentiary record of this review. Def.'s Resp. to Pls.' Mot. for J. on the Agency Record at 19, ECF Nos. 35–36 (Nov. 17, 2023) ("Gov. Br.").

The parties agree that Commerce's determination must be supported by substantial evidence contained in the administrative record unique to this review. Resp't Br. at 27–28; Gov. Br. at 19–20. Nevertheless, Respondents have not cited any statute, regulation, or binding court precedent that prevents Commerce from adding information from a prior review to the administrative record of a new review. See generally Resp't Br. at 28. Commerce may have legitimate reasons, such as to prevent double counting,[4] to consider information from prior

---

[4] See, e.g., IDM at 8 (expressing concern that altering the date of sale between PORs could risk double counting).

reviews.[5]

Here, Commerce used the information, not to make an independent factual determination, but to provide context to Respondents' questionnaire responses stating that their sales process had not changed since the prior review.  See PDM at 11; see, e.g., Colakoglu's Response to Second Supplemental Sections A-C Questionnaire at S3-12, C.R. 282–289, P.R. 138 (June 6, 2022) ("There have not been changes to Colakoglu's sales process since the prior period of review."); Kaptan's Response to the Department's Second Supplemental Sections A-C Questionnaire at S3-4, S3-7, C.R. 253–268, P.R. 126 (May 20, 2022) (admitting that as in prior reviews here the "material terms of the sale may change between the contract date and the internal order date in the normal course of business").  With this context, Commerce understood the responses to mean that the sales processes which led to a finding that the invoice date was the appropriate date of sale were the same processes employed here.  IDM at 8–9, 11–12.  The Preamble refers to the importance of business practices in a particular industry and whether renegotiation is likely to happen.  62 Fed. Reg. at 27,348–49.  Accordingly, it was reasonable for Commerce to use information from a prior review about the sales processes, and which Respondents confirmed had not changed, to determine the appropriate date of sale.  Additionally, the fact that there had been no change to sales processes which had previously resulted in using the invoice date, although not determinative itself, supports the presumption of using the invoice date as the date of sale here.

### b. The terms of the contract allowed for deviation in a material term

In their questionnaire responses, Respondents stated that the material terms of a sale may change between the contract date and invoice date.  Kaptan Response to the Department's Second

---

[5] In its response brief, the RTAC argues that adding information from prior reviews to the administrative record is a common practice.  Rebar Trade Action Coalition's Resp. Br. at 32–33, ECF Nos. 37–38 (Nov. 17, 2023).

Supplemental Sections A-C Questionnaire at S3-7, C.R. 253–68, P.R. 126 (May 20, 2022) ("Kaptan 2nd SQR"); Colakoglu's Response to Second Supplemental Sections A-C Questionnaire at S3-10, C.R. 282 –289, P.R. 138 (June 6, 2022). The Government argues that these concessions "preclude[] a finding that the material terms of the sale were fixed at the contract date." Gov. Br. at 16. Respondents assert, however, that the determinative factor is whether the material terms changed, not whether the terms could have changed. Resp't Br. at 22–32.

Prior caselaw is filled with examples of Commerce considering contracts that allow for minor changes between the contracting and invoicing stages. Commerce has decided cases both ways, sometimes finding the material terms were established despite an allowance for tolerances and sometimes determining the presence of tolerances meant the material terms were not established. See, e.g., Nakornthai Strip Mill Co. Ltd. v. United States, 33 CIT 326, 614 F. Supp. 2d 1323 (2009); Eregli Demir v. Celik Fabrikalari T.A.S, 308 F. Supp. 3d 1297, 1312 (CIT 2018); Certain Cut-to-Length Carbon Steel Plate from Romania, 72 Fed. Reg. 6522 (Dep't Commerce Feb. 12, 2007) and accompanning Issues and Decision Memorandum for the Administrative Review of Certain Cut-to-Length Carbon Steel Plate from Romania: Final Results of Antidumping Duty Administrative Review and Final Partial Rescission, A-485-908, POR 08/01/2004-07/31/2005 (Dep't Commerce Feb. 2, 2007). In Eregli Demir, the court considered two issues: first, whether a clause giving the buyer the option to receive a cash discount constituted a material change; and second, whether a clause allowing for quantity changes within a certain tolerance constituted a material change. Eregli Demir, 308 F. Supp. 3d at 1308–11. For the first, the court found there was no material change as the payment terms do not change between contract and invoice as the buyer can always exercise either option and those two options are not subject to change. Id. at 1309. For the second clause, however, the court found that the seller's "ability to

ship items not in conformity with the quantity ordered or the tolerance limits" supported Commerce's finding that the material terms were not set on the contract date. Id. at 1312.

Here, the contracts are similar to the latter example from Eregli Demir. Although the price per unit is set, tolerances exist both for individual products, i.e., line-items, and for the aggregate product sent. See IDM at 10–12; see, e.g., Kaptan's Response to Supplemental Sections A-D Questionnaire at S1-5–6, C.R. 169–179, P.R. 88 (Mar. 11, 2022). Accordingly, a seller retains significant discretion to adjust the line-item quantities, resulting in a wide variety of product mixes to be shipped under the same contract. Under these circumstances, the court is hard-pressed to consider the material term of quantity to be "firmly established" at this point regardless of whether the contract maintains a consistent aggregate quantity.

The existence of such tolerances, however, does not "preclude[] a finding that the material terms of the sale were fixed at the contract date" as the Government contends. Gov. Br. at 16. There are some scenarios, such as where an unutilized tolerance is included in boilerplate language of which the parties were unaware or where the tolerance is extremely small, where Commerce found the presence of the tolerance did not impact the material terms of the sale. See, e.g., Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States, 33 CIT 695, 738–40, 625 F. Supp. 2d 1339, 1375–77 (2009) (finding that Commerce's decision that a proprietary clause was a routine boilerplate clause of no real significance was reasonable); Yieh Phui Enterprise Co. v. United States, 35 CIT 1122, 1128–29, 791 F. Supp. 2d 1319, 1325–26 (2011) (speculating that there could be an exception for changes that are so small as to be de minimis). Here Commerce did not find those scenarios to be present.

Respondents argue that such a scenario exists here as the parties do not consider line-item changes to be a material term. Resp't Br. at 20–21. As evidence, Respondents pointed to the lack

of post-contract amendments, despite deviations from the line-item tolerances.  Resp't Br. at 24; Kaptan 2nd SQR at S3-4–5.  Although Commerce may consider this evidence as to whether there was a "meeting of the minds," what is or is not a material term in a date of sale inquiry is set by regulation and caselaw, not the parties.  See supra DISCUSSION § I; see also infra DISCUSSION § II(c).  There is neither information on the record indicating that the parties were unaware of the tolerances, nor information that the tolerances were de minimis.  Parties may take actions for a number of reasons, and the acceptance of a good that does not meet contract parameters could be entirely unrelated to whether that parameter is a material term.  Accordingly, it is reasonable for Commerce to presume here that the presence of a tolerance in contract language implies that changes to quantity regularly occur and that the material terms are not settled until the invoice date.

      **c.  The quantities specified in the invoice were materially different from those in the contract**

Respondents argue that the material terms of the contract did not change as the aggregate quantity remained stable.  Resp't Br. at 23–24, 27–28.  The Government contends that the material term of "quantity" refers to more than the aggregate quantity of product, and that there were changes to line-item quantities that exceeded the tolerances specified in the contract.  Gov. Br. at 16–19.  Limiting the material term of quantity to only the aggregate number, the Government argues, would allow a seller to completely shift the makeup of a sale between the contract and invoice stage and therefore fail to achieve the statutory directive.  Id.

Respondents cite no binding precedent for the proposition that the material term of quantity

only refers to aggregate quantity. Resp't Br. at 18–19.[6] To the contrary, the court has previously found that Commerce was reasonable in treating a change in a line-item quantity within a tolerance as a change in a material term. ArcelorMittal USA LLC v. United States, 302 F. Supp. 3d 1366, 1376–77 (CIT 2018). Just as here, in ArcelorMittal the court examined a set of facts where the contract allowed for a tolerance, and then the invoice finalized the exact quantity. Id. at 1372–73. Commerce observed in ArcelorMittal that in one instance the quantity shipped was outside of the tolerance. Id. Commerce, relying on a clause in the contract that specified the importance of the quantity term, determined that the terms of the sale were not "firmly" and "finally" established until the date of the invoice. Id. at 1376–77. Considering the contract clause and the change outside of the tolerance level, the court affirmed Commerce's determination. Id.

Respondents attempt to distinguish ArcelorMittal on two counts. First, Respondents argue that the rebar at issue here is a different product from the cold-rolled steel at issue in ArcelorMittal. Resp't Br. at 30. Second, Respondents assert the contracts are different as the parties here "agree to quantity tolerances with respect to the total order quantity." Id. The court is unconvinced that these differences are material. First, there is no information on the record to establish that the rebar industry is significantly different from cold-rolled steel such that the line-item quantity amounts are immaterial. Second, although Respondents correctly point out that here there is no clause indicating the importance of quantity as in ArcelorMittal, neither the court nor Commerce

---

[6] To establish Commerce's practice, Respondents reference several determinations from Commerce and one CIT case, all of which are at least fifteen years old, where Commerce disregards line-item changes that are not significant "so long as the overall quantity is within the quantity tolerance level . . . ." Resp't Br. at 18–19 (quoting Nakornthai, 33 CIT 326, 334, 614 F. Supp. 2d 1323, 1332 (2009)). Yet, the issue considered in Nakornthai was whether Commerce had properly considered the significance of the line-item quantity tolerance level after Commerce found the change in the line-item quantity was significant. Id. at 335–36, 1332–33. Thus, even the nonbinding precedent cited by Respondents exhibits Commerce treating a change to a line-item quantity as material.

indicated the clause was essential to that determination. Additionally, Commerce found that similar to ArcelorMittal, the size breakdowns of individual rebar products is "fundamental." IDM at 11. Thus, it would be reasonable for Commerce to conclude that the line-item quantity term here is important just as it was in ArcelorMittal.

Here, Commerce found multiple instances where the quantity changed beyond the line-item tolerances set by the contract. IDM at 9–10, 12. Considering Commerce's determination of the importance of the line-item tolerances, Commerce reasonably determined these changes were to a material term and that a change to a line-item quantity beyond the specified tolerance supports the presumption of using the invoice date as the date of sale.

### III. Commerce followed its established pattern and practice

Finally, Respondents argue that Commerce failed to explain its decision to disregard its established practice of setting the date of sale as the time when there was a "meeting of the minds." Resp't Br. at 32. The Government asserts that Commerce acted within its established practice and found that there was not sufficient evidence to rebut the presumption of using the invoice date. Gov. Br. at 21.

As articulated in ArcelorMittal, to rebut Commerce's presumptive selection of the invoice date, the proposing party must demonstrate that the alternative date is the only reasonable one. ArcelorMittal USA LLC, 302 F. Supp. 3d at 1377–78 (citing Toscelik Profil v. Sac Endustrisi A.S., 256 F. Supp. 3d 1260, 1263 (CIT 2017)). "An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from that evidence." Viet I–Mei Frozen Foods Co. v. United States, 839 F.3d 1099, 1106 (Fed. Cir. 2016). Where reasonable minds could disagree, Commerce's presumptive selection of the invoice date stands. ArcelorMittal USA LLC, 302 F. Supp. 3d at 1377–78.

As described above, Respondents fail to meet their burden.  Each of the grounds listed by Commerce reasonably support using the invoice date.  Respondents reference no additional factors, instead choosing to double down on their argument that the material terms did not change between the contract date and invoice date.  <u>See generally</u> Resp't Br.  In the light of the court's determination that material term of quantity includes changes to line-item quantities, and in addition to Commerce's other stated reasons for using the invoice date, substantial evidence supports Commerce's determination that the meeting of the minds occurred at the invoice date.

Assuming <u>arguendo</u> that Respondents had additional evidence to support the use of the contract date, Commerce has not broken from its established practice by using the invoice date as supported by its presumption and substantial evidence.  Accordingly, Respondents' final argument fails.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's final results.  Judgment will enter accordingly.

 /s/ Jane A. Restani  
Jane A. Restani, Judge

Dated: <u>April 4, 2024</u>  
New York, New York